**Troy MARTIN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 85–603.**

District of Columbia Court of Appeals.

Argued July 1, 1987.

Decided Dec. 18, 1989.

ion.

Jeanne Asherman, appointed by this court, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Mary Ellen Abrecht and Barry M. Tapp, Asst. U.S. Attys., were on the brief, for appellee. Bruce A. Peterson, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before BELSON, TERRY, and STEADMAN, Associate Judges.

TERRY, Associate Judge:

█ Appellant Martin was convicted of first-degree felony murder while armed [1] and first-degree burglary while armed.[2] On appeal Martin argues that the trial court erred in denying his motion to suppress his confession. Martin contends that his arrest was not based on probable cause and that the police lacked consent to enter his grandparents' home to make the arrest. Consequently, he maintains, the confession which he gave later at the police station was the fruit of an illegal arrest and should have been suppressed.

We hold, first of all, that appellant has standing to assert his Fourth Amendment claim. Because the trial court's finding of probable cause did not resolve some crucial factual issues, we remand the case for further findings. In addition, the court did not rule on the voluntariness of the consent given to the police by Martin's grandparents to enter the house and arrest their grandson. We therefore direct the court on remand to determine whether a valid consent was given before the police entered the house. In the alternative, if the trial court finds that consent was given after the police entry, it must then decide whether such consent retroactively validated the entry. If the court concludes either that there was no probable cause or that no valid consent was given, and if the government fails to show that the confession was not a fruit of the arrest (which so far it has not been called upon to do), then the confession, although voluntarily made, must be suppressed and a new trial ordered; otherwise, however, the judgment of conviction shall stand undisturbed.

## I

In January 1983 Charles Randolph lived with his girl friend, Gwen Matthews, and her son in a house at 1511 Marion Street, Northwest. Matthews knew that Randolph earned his living by selling heroin and that on the evening of January 24 he had several $100 bills in his possession.

On January 25 Matthews went to work as usual at 6:15 a.m. At about 10:30 she spoke by telephone to Randolph, who was waiting at home for a visitor to arrive. Around 12:30 p.m., when Matthews returned home for lunch, she found the front door unlocked, clothing scattered all over the floor, and the basement and back doors open. Alarmed, she ran around the corner to her aunt's house. After calling the police to report an apparent burglary, Matthews returned to her own house with her aunt and two other relatives. They all went inside together and found the dead body of Charles Randolph in an upstairs

---

1. D.C.Code §§ 22–2401, 22–3202 (1989).

2. D.C.Code §§ 22–1801(a), 22–3202 (1989).
   The jury also found Martin guilty of armed robbery, in violation of D.C.Code §§ 22–2901 and 22–3202 (1989). The trial court correctly refrained from imposing sentence on the armed robbery count because the robbery was the predicate for the felony murder conviction. The government nevertheless suggests in its brief that Martin's "conviction" of armed rob-

bery should be vacated under *Whalen v. United States*, 445 U.S. 684, 694, 100 S.Ct. 1432, 1439, 63 L.Ed.2d 715 (1980). A mere jury verdict, however, is not a conviction. *See Franklin v. United States*, 555 A.2d 1010, 1012 (D.C.1989) (citing cases). Because no judgment was ever entered on the armed robbery verdict, there is no armed robbery conviction to vacate. We therefore reject the government's suggestion because it is based on a legally faulty premise.

bedroom. He was lying across the bed on his stomach with his hands crossed behind him, and blood on the top of his head. He had been shot in the right side of the head with a .38 caliber revolver. It was later determined that the killer had fired the gun through a pillow which was pressed against Randolph's head. The dresser drawer where Randolph normally kept his money was open, but there was no money in it. When the police came a few minutes later, they found his empty wallet lying on top of a pile of clothes. The police found no heroin in the house, nor did they find any physical evidence that might lead to a suspect.

A few hours later, at about 4:00 o'clock in the afternoon, the police received an anonymous telephone call from a man who said he knew something about the shooting in the 1500 block of Marion Street. The caller, who did not initially give his name, was later identified as Edward Moseley.[3] Detective Alphonso Terrell of the Homicide Division took the call, and two days later, on January 27, he interviewed Moseley in person at the homicide office.[4] Moseley told Terrell that on the day of the shooting he had walked from his mother's home on Marion Street to his girl friend's house. On the way he saw someone he knew as "Skeeter" on the steps in front of 1511 Marion Street and another person named "Troy" standing near the alley, apparently acting as a lookout. Moseley recognized Troy and waved to him; they were not close friends, however, but merely acquaintances, having met casually a year or two earlier. When a police car came into view, both men fled. A few hours later, on

his way home from the visit to his girl friend, Moseley saw police cars in front of 1511 Marion Street and heard a woman say that someone had been shot.

Shortly thereafter Moseley went out to a neighborhood liquor store. As he was entering the store, he overheard Skeeter describing to a third person how someone had put a pillow over another man's head and shot him. Skeeter also mentioned something about three or four hundred dollars. After he returned home, Moseley called the police anonymously and gave them the names of "Troy" and "Skeeter" as the men he had seen standing outside 1511 Marion Street.

Detective George Steel was in the homicide office when Moseley's call came in. Either then or sometime later (the exact time is not clear from the record) Steel learned that two persons named "Troy" and "Skeeter" were suspects in the recent Marion Street murder.[5] Steel knew two men with those names who hung out together in the area of Marion Street. He carried pictures of them around with him because the two had earlier robbed his wife at gunpoint. Detective Steel supplied Terrell with their pictures,[6] full names, and addresses. He also told Terrell that Skeeter (Elliot Johnson) was in prison at the time of Randolph's murder, but that Skeeter had a brother named Benjamin who looked like him. Detective Terrell then prepared an array of photographs, which included pictures of Skeeter Johnson, Benjamin Johnson, and Troy Martin, and invited Moseley to his office to look at the array. When Moseley saw the pictures, he identified

**3.** The anonymous caller had mentioned on the phone that he was the brother of a Metropolitan Police officer in the Fourth District. After a memorandum was read at all the roll calls in the Fourth District asking if anyone had a brother living near the 1500 block of Marion Street, Officer Harold Moseley called the homicide office, and with his assistance the anonymous caller was identified as his brother Edward.

**4.** At the hearing on the motion to suppress, the evidence established that Detective Terrell did not take notes when he first talked to Edward Moseley. In a later conversation Terrell did take some notes in which he referred to three

suspects. These notes, however, were later determined to be incorrect because Moseley had told him that he had seen only two men, not three. Terrell did not revise his notes after this error was discovered.

**5.** Steel testified that he first heard these names at a roll call. Terrell's testimony, however, indicates that Steel may have picked them up from overhearing Terrell's half of the telephone conversation with Moseley on January 25.

**6.** Steel testified that he gave Terrell the photographs no later than two days after the homicide, which would have been January 27.

Benjamin Johnson and Troy Martin as the two men he had seen on Marion Street.[7]

Some time after Detective Steel had given him the pictures, Detective Terrell asked Sergeant Joseph Thomas to bring Troy Martin to police headquarters for questioning. Thomas, however, misunderstood Terrell's request and thought that Terrell wanted Martin arrested. On February 3 Thomas went to the home of Martin's mother and told her that her son was involved in a recent shooting. Martin was not there, but his mother told Sergeant Thomas that he could be picked up at her parents' home on New Jersey Avenue. Before Thomas left, Martin's mother called her mother and made sure that Martin would be there when Thomas arrived.

Sergeant Thomas, along with four uniformed officers, then went to the grandparents' home. It was early in the afternoon. The officers were met at the door by appellant's uncle, who became loud and disorderly and tried to impede the officers. When Thomas told the uncle that he was looking for Troy Martin, the uncle replied that Troy was "not at home." Just at that moment, however, Troy Martin came down the stairs from the second floor. When he saw the police, he suddenly stopped and "appeared to be nervous." Sergeant Thomas recognized Martin as the person he was looking for [8] and told Martin "that we wanted him." At about the same time, Martin's grandfather came forward and, in an attempt to silence the uncle, hit him and knocked him to the floor. After a brief conversation with the grandparents, who said that their daughter had called and advised that the police were "coming to pick up Troy," the police placed Martin under arrest. Thomas testified that other family members were also present and that, with the exception of the uncle, they all "cooperated with me very well."

Martin was advised of his *Miranda*[9] rights in the police cruiser and again several times at police headquarters, where he signed a waiver. He had been placed in handcuffs when he left his grandparents' house, and when he arrived at the station, he was handcuffed by one wrist to a desk in an interview room. However, Lieutenant William Ritchie, who knew there were no plans to charge Martin at that time, told Detective Joseph McCann that Martin should not have been placed under arrest. Martin was then informed that he was not under arrest and was released from his handcuffs.

McCann tried for about fifteen minutes to question Martin, but without success. Then Lieutenant Ritchie began to interview Martin. After telling him that he was not under arrest and that he would be taken home after the interview,[10] Ritchie asked Martin about the murder of Charles Randolph. At first Martin denied any involvement in the crime. Then he acknowledged that he had been on the scene with two others, Benjamin Johnson and Maurice Riley, but he insisted that he had remained outside in the alley while the others went into the house. Finally he admitted that he and the others had planned to rob Charles Randolph and had gone to his house to carry out their plans. When Randolph answered the door, Riley pushed him back so that he fell down. The trio entered the house, and Riley, who was armed with a pistol, demanded Randolph's money. Randolph led them upstairs into his bedroom. There they robbed him of $500, and Riley

---

7. The date of Moseley's photographic identification is not clear from the record. Detective Terrell testified on the first day of the suppression hearing that Moseley did not identify Martin's picture until after Martin had been arrested. The next day, however, he changed his testimony and said that Moseley had identified Martin's picture before the arrest. Moseley himself, testifying at the suppression hearing, could not remember the date at all, but at trial he testified that he looked at the pictures "a couple of days, a week" after his first visit to the homicide office, which had been on January 27.

8. Detective Terrell had previously given Thomas a copy of Martin's photograph.

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. Martin testified at the suppression hearing that he was never informed that he was free to leave the station, and that Lieutenant Ritchie told him he would be allowed to go home only after he made a statement.

shot him once in the back of the head, firing his gun through a pillow. Ritchie's entire conversation with Martin lasted about forty-five minutes.

After Martin confessed orally to Lieutenant Ritchie, Detective Terrell arrived and took a written statement, preceded by a re-advising of his *Miranda* rights. After Martin signed this statement, which was in two parts,[11] the police took him back to his grandparents' house. A few weeks later, on March 14, Detective Terrell obtained an arrest warrant for Martin, and he was arrested on April 7.

Martin moved to suppress his statements, both oral and written, on the ground that they were involuntary. After an evidentiary hearing, the trial court denied the motion, finding that the statements had been voluntarily made. Although the motion had not challenged Martin's arrest, at the hearing his counsel[12] raised the additional argument that the arrest was not based on probable cause. The court did not rule on this issue but took it under advisement, allowing counsel to file a supplemental memorandum presenting his arguments in writing. That memorandum, when filed, did not address the probable cause issue but asserted instead that the police lacked consent to enter the grandparents' home to make the arrest. The government filed a response, asserting that the evidence supported a finding of consent. Nothing further happened for several months,[13] and in due course the case was reassigned to another judge for trial.

On January 28, 1985, almost a year after the suppression hearing, Martin's counsel filed a motion to reopen the hearing on the motion to suppress the confession. The government, in response, asserted for the first time that Martin lacked standing to complain that the police entry into his grandparents' home was constitutionally in-

valid. The government also filed a supplemental memorandum contending that the police had probable cause to arrest Martin, and that the confession was not the fruit of a warrantless arrest. The original motions judge held a hearing on the motion to reopen, and at that hearing he expressed a willingness to hear additional testimony. Defense counsel was not prepared to put on witnesses, but attempted instead to make a proffer regarding their anticipated testimony on the issue of consent.[14] The judge, however, refused to delay the trial, which was set for the following Monday, in order to permit Martin to present witnesses on the motion to reopen. After further discussion the judge denied the motion and said, "I credit the testimony of the police officers and find consent to enter the premises and probable cause to make the arrest." The judge also ruled that Martin had no standing to challenge the entry of his grandparents' home.

When the case went before the newly assigned judge for trial, defense counsel moved orally for reconsideration of the denial of the motion to suppress. Because the court file was not entirely clear as to what had happened, the trial judge consulted with the motions judge, who agreed to reopen the record and hear additional evidence on the consent issue. After a second consultation, however, the trial judge announced that the trial would go forward, and the question of whether to hold a further evidentiary hearing was not raised again. A jury was sworn the next morning, and after a seven-day trial it found Martin guilty as charged.

This appeal presents four issues: first, whether Martin has standing to assert constitutional violations based on the police entry into his grandparents' home; second, whether there was probable cause to sustain Martin's warrantless arrest; third, whether a valid consent was given to the

---

11. Martin's original statement was augmented by a "supplemental statement" adding a few details. Martin signed both documents.

12. Martin is represented by different counsel on appeal.

13. There is some indication in the record that Martin was hospitalized for at least part of the time between the suppression hearing and the trial.

14. Defense counsel proffered no evidence and made no argument on the standing issue.

police to enter the house; and fourth, whether Martin's confession was voluntary.

## II

■ The government maintains that Martin does not have standing to challenge the police entry into his grandparents' home because it was not his own residence. Before we decide that question, however, we must address the government's preliminary assertion that Martin is raising the standing issue for the first time on appeal, in that he "failed to dispute the factual predicate of the government's standing argument" below. *See Rakas v. Illinois,* 439 U.S. 128, 130–131 n. 1, 99 S.Ct. 421, 423–424 n. 1, 58 L.Ed.2d 387 (1978). Given the tortuous procedural history of this case, we conclude that Martin's trial counsel adequately—but just barely, and with the indispensable aid of the prosecutor—preserved the standing issue for appellate review.

One year after the suppression hearing, Martin filed a motion to reopen the record. The government's response asserted for the first time that Martin lacked standing to allege constitutional violations in the police entry. At the hearing on the motion to reopen, Martin's counsel said initially that he wanted to "present witnesses ... to show whether or not there was consent," but that he was not prepared to do so on that day. The motions judge replied that he was ready to rule and added:

> I think you [are in] an awful tough spot ... because all the laws are against you.... But if you want to put something in the record, I will let you do that. I don't want to be precipitous, but you don't have any standing. It's very clear on that.

To this counsel replied, "I think I do have standing," but he admitted that he had filed no response to the government's pleading. After counsel made a factual proffer on the issue of consent, the judge denied the motion to reopen and ruled in addition that Martin had "no standing whatsoever to move to suppress...."

The following Monday, when the case was called for trial, the trial judge initially refused to consider the standing issue, but he did say that the motions judge was willing to hold a further hearing the next day, before the trial began. As the trial judge was discussing the resolution of the standing issue with counsel, the prosecutor, who was arguing against reopening the hearing, stated that since defense counsel "was going to put on all of these witnesses during the trial anyway ... it may be the factual record in the trial itself would be complete concerning the testimony he wants to present to [the motions judge]." This suggestion by the prosecutor—that the defense might have an opportunity to present evidence on the issue of standing in the course of the trial—had the effect of allowing the standing issue to be resolved by the trial judge, not by the motions judge. The fact that the trial judge did not explicitly rule on the issue does not now preclude us from considering it.

■ There is, in any event, sufficient evidence in the record to support the conclusion that appellant had standing to challenge the police entry of his grandparents' home; indeed, there is no evidence otherwise.[15] Sergeant Thomas testified at the suppression hearing that Martin's mother "indicated that he was not staying with her. He had been staying with his grandmother [on] New Jersey Avenue, Northwest." Later, at trial,[16] Martin's aunt testified that she lived with her mother and

---

**15.** The government points to a statement in Martin's supplemental memorandum, filed shortly after the suppression hearing, which it regards as a tacit concession that he did not live at his grandparents' house. We find the cited language too ambiguous to be deemed a concession; besides, an unsworn statement in a pleading cannot override contrary testimony taken under oath in open court.

**16.** In deciding the standing issue, we are free to consider all the evidence at the suppression hearing as well as the undisputed trial testimony. *See Rushing v. United States,* 381 A.2d 252, 257 (D.C.1977); *Masiello v. United States,* 113 U.S.App.D.C. 32, 34, 304 F.2d 399, 401 (1962).

father and that her nephew, Troy Martin, was living most of the time with his grandparents (the aunt's parents) during February of 1983. He stayed most of the week in his grandparents' home, sleeping on the couch downstairs. It is also significant that after his arrest Martin's mother instructed the police to return Martin to his grandparents' home on New Jersey Avenue.

This evidence was sufficient to establish that Martin had a reasonable expectation of privacy in his grandparents' home. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979); *Rakas v. Illinois, supra,* 439 U.S. at 142 n. 11, 99 S.Ct. at 430 n. 11; *United States v. Lyons,* 227 U.S. App.D.C. 284, 706 F.2d 321 (1983). As a part-time resident, Martin had a protected privacy interest in that home. *See United States v. Booth,* 455 A.2d 1351, 1353 (D.C.1983). On the record before us, we hold that Martin had standing to challenge the police intrusion. *See United States v. Robinson,* 225 U.S.App.D.C. 282, 698 F.2d 448 (1983). We therefore must consider whether the warrantless arrest violated Martin's Fourth Amendment rights.

### III

█ We begin our discussion of Martin's arrest with the observation that seizures [17] in a home without a warrant "are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *see Gant v. United States,* 518 A.2d 103, 106 (D.C. 1986); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). In the absence of consent, hot pursuit, or exigent circumstances, the police may not generally enter a home to make an arrest unless they have a warrant. In the instant case, the government must clear two hurdles in order to sustain Martin's arrest. First, it must show that there was probable cause to arrest him; second, it must establish that a valid consent to enter was given to the police by someone with

authority over the grandparents' home. Because the record before us does not support the motions court's resolution of either issue, we must remand for further findings.

### A. *Probable Cause*

█ The government maintains that the record amply supports the finding that there was probable cause to arrest Martin on February 3. Martin argues, to the contrary, that the motions court made no relevant findings of fact. We agree with Martin. "Although findings are not required when there is no factual dispute ... or where the record clearly reflects the grounds of the trial court's decision ... neither of these exceptions applies in this instance." *Don't Tear It Down, Inc. v. District of Columbia,* 395 A.2d 388, 391 (D.C.1978) (citations omitted). Without clear factual findings on probable cause, "we must determine whether the court's denial of the motion to.suppress is sustainable under any reasonable view of the evidence." *In re B.K.C.,* 413 A.2d 894, 901 (D.C.1980) (citations omitted). Because the court's basis for finding probable cause is not clear, a remand is necessary.

There is probable cause to arrest when the facts and circumstances within a police officer's knowledge, of which he or she has reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed. *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949). Although Detective Terrell strongly suspected that Martin committed the murder, suspicion alone will not sustain an arrest. "Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.'" *Dunaway v. New*

---

17. A "seizure" includes the arrest of a person. *United States v. Watson,* 423 U.S. 411, 428, 96 S.Ct. 820, 830, 46 L.Ed.2d 598 (1976). The government does not dispute that the seizure of Martin in his grandparents' home on February 3 was an arrest.

*York,* 442 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979) (citation omitted).

A key factor in this case linking Martin with the crime was Moseley's photographic identification of Troy and Skeeter. Although the timing of that identification was crucial to the determination of probable cause,[18] the trial court did not make specific findings of fact as to when Detective Terrell received the pictures from Detective Steel and showed them to Moseley. Martin asserts that Moseley made no photographic identification before the arrest. Moseley could not pinpoint the date when Detective Terrell showed him the pictures; see note 7, *supra.* Terrell testified that he saw Moseley in person only once between January 25, the date of the murder, and February 3, the date of the arrest. If the photographs from Detective Steel were not shown to Moseley during this one interview, the identification must have occurred after the arrest and could not have served as a basis for probable cause. At the suppression hearing Detective Terrell initially testified that he did not show Moseley any photographs before Sergeant Thomas arrested him, but the next day he testified that Moseley had made a photographic identification before the arrest.[19] The motions judge inferred from the unclear testimony that there was a photographic identification by Moseley before the arrest.[20] We think a more exact finding on when the photographic identification occurred is necessary to sustain the court's determination of probable cause.

In addition to the photographic identification, another important piece of evidence on the issue of probable cause was the liquor store conversation that Moseley overheard in which Skeeter (or the person Moseley thought was Skeeter) described how someone had placed a pillow over a man's head and shot him. This conversation linked the supposed Skeeter with the crime because it included details of the shooting that could not have been known by someone who was not present at the scene of the murder. The record, unfortunately, does not make clear when Detective Terrell found out about the conversation. Moseley testified at the suppression hearing that during his first interview, on January 27, he told Detective Terrell about the liquor store conversation he had overheard. Terrell's testimony, however, was uncertain on this point, and the court made no specific finding as to whether he first learned of the conversation before or after the arrest.

In ruling that there was probable cause for Martin's arrest, the motions court stated, without elaboration, that it credited the testimony of the police officers. But that testimony was at times inconsistent, as was the information provided to the police by Moseley.[21] In these circumstances we can-

---

**18.** If Moseley did not make his photographic identification before the arrest, then it cannot be assumed that the "Troy" and "Skeeter" whom Steel knew were the same "Troy" and "Skeeter" that Moseley knew. A photographic identification prior to the arrest would ensure that both the police and Moseley had properly identified the same suspect. "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

**19.** Neither Detective Terrell's affidavit in support of an arrest warrant, filed on March 14, 1983—more than five weeks after the arrest— nor his testimony at the preliminary hearing mentioned Moseley's photographic identification.

**20.** The judge said:
> [I]t would appear that the photographs were up there [in the homicide office] from Steel on [January] 27th, and everybody says that he was shown pictures, they are just not sure when it happened. But we do know he was positively identified, because the picture was given to Sergeant Thomas on [February] 3rd, and I think the inference is that [Martin] had been identified.

See also note 6, *supra.*

**21.** At times the court expressed concern about the lack of thoroughness with which the police conducted their investigation. In addition, Detective Terrell's testimony lacked detail because he had failed to take adequate notes, and the notes he took were not always correct (see note 4, *supra* ). On one occasion the court, with obvious exasperation, said to Terrell:

not tell what testimony the court was crediting. Consequently, we must ask the court on remand to make more detailed findings on the critical issues of fact, and then to rule *de novo* on the probable cause issue. *See United States v. Jones,* 275 A.2d 541, 543 (D.C.1971).

## B. *Consent*

■ Another critical issue in this case was whether the police entered the grandparents' house with their consent. Although the motions judge found such consent, the evidentiary basis for that finding is not entirely clear. We therefore direct the court on remand to determine (1) whether the consent given by the grandparents was voluntary, (2) whether it was given before or after the police entry, and (3) whether, if given after entry, it operated retroactively to make the entry lawful.

The Fourth Amendment "prohibits the police from making a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York, supra,* 445 U.S. at 576, 100 S.Ct. at 1374–75. The government's burden in this case is to demonstrate that consent was given by "one who possesses common authority over the premises" (*e.g.,* either of the grandparents) in order for the consent to be valid against the "non-consenting person with whom the authority is shared" (appellant Martin). *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). That burden breaks down into two parts. First, the government must prove that the consent was voluntary. *E.g., Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). Second, there must be "clear and positive testimony" that the police had consent to enter the premises at the appropriate time. *Judd v. United States,* 89 U.S. App.D.C. 64, 66, 190 F.2d 649, 651 (1951). Once the court determines that the grand-

parents' consent was valid, then that consent will operate against Martin, the non-consenting party with whom the premises were shared. *See United States v. Matlock, supra,* 415 U.S. at 177, 94 S.Ct. at 996; *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969); *Villine v. United States,* 297 A.2d 785, 786–787 (D.C.1972); *Dupont v. United States,* 259 A.2d 355, 357–358 (D.C.1969).

The government must "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–249, 93 S.Ct. 2041, 2058–2059, 36 L.Ed.2d 854 (1973). The sudden appearance of five police officers on their doorstep may well have convinced the grandparents that they had no choice but to consent to the police entry. It has long been recognized that " 'invitations' to enter one's house, extended to armed officers of the law who demand entrance, are usually to be considered as invitations secured by force.... Intimidation and duress are almost necessarily implicit in such situations...." *Judd v. United States, supra,* 89 U.S.App.D.C. at 66, 190 F.2d at 651 (citations omitted). On the other hand, the record shows that both grandparents had been forewarned by Martin's mother that the police would be arriving to arrest her son Troy. There was no evidence that the grandparents were pressured or intimidated by the police, at least not directly. Indeed, Martin's grandfather was apparently determined to let the police enter the house and make the arrest because he knocked Martin's uncle to the floor after the uncle confronted the police. Since there was evidence on both sides of the issue, and since we are remanding for other reasons anyhow, we direct the court on remand to make an express finding on

Don't you write these things down? ... How are you going to be able to come to court and answer questions if you don't write it down? You tell me all this: "I don't remember." "I don't know." "I can't remember."

&ast; &ast; &ast; &ast; &ast; &ast;

I am having a hard time understanding how you ran the investigation. Everything is "I don't know," "I didn't write any notes." The one note you write, you tell me it's all wrong. Yet you never corrected it. I don't understand this.

the voluntariness of the grandparents' consent.[22]

The government must also demonstrate that consent was given at the appropriate time. On the facts of this case, the timing of the consent is a separate issue, one which was not clearly decided below. Sergeant Thomas testified at the suppression hearing that he was met at the front door by Martin's uncle, who gave him "a difficult time" at the doorway. Thomas nevertheless gained entry, and once he was inside, Martin's grandmother gave him permission to take her grandson out of the house. Officer Steven Mann testified that Thomas was the first officer to enter the house. Neither Mann nor Thomas, however, mentioned the presence of Martin's aunt, nor did either officer's testimony establish that consent was given before they entered.

The trial testimony was somewhat different. Sergeant Thomas testified that when he and his fellow officers first went to the house, they knocked on the door and "attempted to gain entry through communication." On cross-examination Thomas said that the door was partially open and that the first person they met was Martin's uncle, who was quite upset and did not invite the officers inside. Thomas then stated that Martin's aunt consented to their entrance. The aunt, Ruth Gleaton, testified that she had heard a knock on the door, and that when she went to answer it, she saw that the police had already entered the house.

Given these ambiguities in the record, we cannot tell whether the officers entered the house before anyone consented to their entry, nor can we discern with sufficient clarity whether there was consent given by the grandparents or possibly by the aunt. We therefore direct the trial court on remand to decide whether consent (assuming it was voluntary) was given before the police entered the house; or, if consent was given after the police entered, whether it had the effect of retroactively validating that entry.[23]

## IV

■ The government asserts that the admissibility of Martin's confession should not depend on the validity of his arrest. Martin maintains, to the contrary, that the confession should have been suppressed because the arrest was illegal, and the confession was a "fruit" of that "poisonous tree." We need not decide this point now. It was not presented to the trial court, and it may or may not be an issue in the case, depending on how the court rules on remand as to the probable cause and consent issues. If an arrest is invalid for any reason, then a custodial confession is inadmissible in the government's case in chief unless intervening events break the causal connection between the arrest and the confession. *See generally Dunaway v. New York, supra,* 442 U.S. at 216–219, 99 S.Ct. at 2258–2260; *Brown v. Illinois,* 422 U.S. 590, 600–604, 95 S.Ct. 2254, 2260–2262, 45 L.Ed.2d 416 (1975); *United States v. Allen,* 436 A.2d 1303, 1308–1310 (D.C.1981). However, if the arrest is lawful, then there is no *Dunaway–Brown* issue.

A related but separate issue is whether the confession was voluntary. We address it here because, if the case has to be retried on account of any illegality in the arrest, the confession—if voluntary—may nonetheless be admissible in rebuttal. *See Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

■ The motions judge ruled that the confession was voluntary and made detailed findings of fact in support of his ruling. Martin does not contend that those findings lack evidentiary support. He asserts instead that Lieutenant Ritchie made specific promises that he would be released

---

22. Although the court found that there was consent, it did not specifically address the issue of voluntariness.

23. We assume without deciding (since the point has not been briefed or argued) that consent in such circumstances can be retroactive, provided that the person giving the consent intends it to be retroactive.

if he confessed (see note 10, *supra*), and that the confession was "coerced" by Ritchie's friendly attitude, which was so convincing that his will was overborne. Both of these assertions are without merit.

With respect to the alleged promises of release, there was conflicting testimony as to whether Ritchie offered to release Martin as a *quid pro quo* for his confession. Ritchie testified that he never made such a promise, and the court expressly credited that testimony and disbelieved Martin's testimony to the contrary. We cannot overturn or look behind that finding. *See* D.C. Code § 17–305(a) (1989). As for the alleged coercion resulting from Ritchie's congenial questioning, appellant's argument has no support in either law or logic. Even if we assume that Martin's personality was so fragile that his will could be overborne by mere friendliness (a notion that is totally without support in the record), the Supreme Court made clear in *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986), that "a defendant's mental condition, by itself and apart from its relation to official coercion, [cannot] dispose of the inquiry into constitutional 'voluntariness.'" Without a showing of "coercive police activity," *id.* at 167, 107 S.Ct. at 522, which was not made below, there is no basis for concluding that Martin's confession was involuntary.

■ When the voluntariness of a confession is contested, the government must prove by a preponderance of the evidence, that the confession is voluntary. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Rogers v. United States,* 483 A.2d 277, 286 (D.C.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985). We hold that the government met that burden in this case. We sustain the conclusion of the motions court that "the statements given to the police were freely and voluntarily given without duress or coercion or trickery by the police."

V

We hold that Martin has standing to challenge the police entry into his grand-

parents' house. We also hold that the evidence supports the trial court's conclusion that Martin's confession was voluntary. We remand this case to the trial court for a clearer determination of whether the police had probable cause to arrest Martin and whether there was a valid consent to enter his grandparents' home. The court may rule on the basis of the existing record, or it may in its discretion hear additional testimony.

If the court on remand determines that there was no probable cause to arrest Martin or that no one validly consented to let the police enter the house, then the government may attempt to show that the confession was not the fruit of the illegal arrest. If the government fails to make such a showing, the conviction must be vacated, the motion to suppress the confession granted, and a new trial ordered. If, on the other hand, the court determines either (1) that there was probable cause along with valid consent to enter the house, or (2) that the confession was not the fruit of the arrest, then the judgment of conviction shall remain undisturbed, subject to any further right of appeal that Martin may have.

*Remanded with directions.*