Jacqua M. BRYANT, Appellant,

v.

UNITED STATES, Appellee.

No. 90–988.

District of Columbia Court of Appeals.

Argued Oct. 22, 1991.

Decided Nov. 20, 1991.

James L. Kelley, appointed by this court, for appellant.

William R. Cowden, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Thomas C. Black, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

FARRELL, Associate Judge:

A jury found appellant guilty of distributing cocaine. D.C.Code § 33–541(a)(1) (1988). On appeal he contends that the trial court erred in not suppressing evidence of a showup identification made outside his rooming house immediately after police entered the house without a warrant and seized him in a common hallway. The government concedes that exigent circumstances did not justify the warrantless entry and seizure but maintains that appellant lacked a legitimate expectation of privacy in the invaded areas of his rooming house, and thus may not challenge the identification evidence on Fourth Amendment grounds. The government further argues that the Supreme Court's recent decision in *New York v. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), renders the post-seizure identification evidence admissible in any event because the

evidence was not the product of the warrantless entry and seizure. Because we are unpersuaded by either of these arguments, we reverse appellant's conviction.

## I.

Shortly before 8:00 p.m. on June 22, 1989, Officer Walton of the Metropolitan Police Department drove to the 4600 block of Georgia Avenue, N.W., to attempt an undercover narcotics purchase. After parking his vehicle, Walton walked north to Crittenden Street. There he met an individual he later identified as appellant and asked about making a drug purchase. When appellant responded, "Twenty?", a street term for twenty dollars worth of crack cocaine, Officer Walton replied that he might want "three," meaning three twenty dollar pieces of crack.

Appellant led Walton south through an alley to the rear of a row house that faced Georgia Avenue. There appellant told Benjamin Brown that Walton wanted a "sixty." Brown relayed this information to another individual, Rodney Pryor, who stood behind a locked, steel-barred security door in the basement of the row house. Officer Walton saw Pryor pass two plastic wraps through the bars to Brown, and heard him shout to appellant, "Didn't I tell you not to bring the customers up to the door." Appellant then led Walton from the yard to the alley and accepted sixty dollars from him in pre-recorded bills. Appellant passed this money to Brown, who had come to the back of the yard, and Brown gave appellant three plastic wraps containing a white rock substance, which appellant handed to Walton. Walton then walked north up the alley toward Crittenden Street, counting the houses as he went. After entering Crittenden, he made his way back to Georgia Avenue and by recounting the houses established that the transaction had occurred in the rear of house number 4621. On reaching his vehicle, Walton immediately called an arrest team that had been stationed at various locations in the area.

In his radio lookout, Walton informed the arrest team that he had three individuals for them. He described appellant as a black male wearing a brown suede-like jacket and gray khaki pants. His description of the other two suspects included the fact that one who spoke with a Jamaican accent could be found in the basement of 4621 Georgia Avenue.[1]

Sergeant Thomas McGuire and other members of the arrest team drove directly to the front of the house at 4621 Georgia Avenue and entered unannounced through the front door, which was wide open. McGuire proceeded immediately through a hallway to a kitchen area in the back of the house. There he found a stairway, descended it, and, along with other officers, apprehended appellant in the basement corridor. McGuire escorted appellant and Brown, who had been captured on the first floor, to the street sidewalk in front of the house. Officer Walton drove by in his vehicle and positively identified appellant and Brown as participants in the drug transaction. This occurred approximately five minutes after the drug sale. Three minutes later, Walton positively identified the third participant, who had been apprehended elsewhere in the neighborhood. The entire police operation, from the moment Walton first parked on Georgia Avenue until the identification of Pryor, took approximately fifteen minutes.

Before trial, appellant moved to suppress evidence of the showup identification as tainted fruit of the warrantless entry into the rooming house. The government argued first that appellant lacked a reasonable expectation of privacy in the common areas the police entered and searched. The trial judge, relying on this court's previous decision in *United States v. Booth*, 455

---

1. It is unclear from the record whether Officer Walton relayed any information concerning appellant's location. A tape transcription of the broadcast was played both at the suppression hearing and at trial. Officer Cauley, a member of the arrest team, testified at the suppression hearing that the tape said subjects number 1 (appellant) and number 3 (Pryor) were inside

4621 Georgia Avenue. Sergeant McGuire, another member of the team, interpreted the tape at trial as saying that the third subject was in the basement of 4621 Georgia Avenue, but did not explain that it said anyone else was inside. Officer Walton testified at trial that appellant was not in the house at the time of purchase and that he left appellant in the alley.

A.2d 1351 (D.C.1983), reached the "tentative view" that appellant had a sufficient privacy interest to establish a Fourth Amendment violation.[2] The government argued next that exigent circumstances excused the warrantless entry. The judge found it unnecessary to reach this claim because, in his view, the Supreme Court's decision in *New York v. Harris, supra,* was "completely dispositive of the analysis" in this case. *Harris* held that, in the circumstances of that case, a station house confession obtained after a probable cause arrest in the home was admissible even though the warrantless home arrest violated the rule of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *Harris,* 110 S.Ct. at 1644–45.

## II.

■■■ The government begins by renewing its argument that appellant did not demonstrate a sufficient expectation of privacy in the area in which he was seized to claim the protections of the Fourth Amendment. We review the trial court's "tentative" contrary conclusion *de novo. See Lewis v. United States,* 594 A.2d 542, 543 n. 3 (D.C.1991); *Martin v. United States,* 567 A.2d 896, 902 n. 16 (D.C.1989). The government correctly points out that appellant, as the person claiming the protections of the Fourth Amendment, had the burden of proving "that he had a legitimate expectation of privacy" in the common areas of the rooming house. *Rawlings v. Kentucky,* 448 U.S. 98, 104–05, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Lewis v. United States,* 594 A.2d at 545; *United States v. Booth,* 455 A.2d at 1353. Nevertheless, we conclude—with the trial judge—that this case cannot be distinguished meaningfully from *Booth,* which rejected a similar claim that a tenant in a rooming house had

not established a reasonable expectation of privacy in a common hallway.

In *Booth,* the court concluded that the defendant residents of a rooming house "had a legitimate expectation of privacy in the front hallway of the house they shared, which was not obviously a rooming house open to the general public." *Id.* at 1354. The evidence shows that 4621 Georgia Avenue was not obviously a rooming house open to the public. It is true that on this occasion the front door was open wide, but the government rightly does not attach decisive significance to that fact. Officer Walton's lookout had not identified the building as a rooming house, nor was there evidence that anyone else had reached that conclusion before the officers made their entry. At trial Walton testified that the 4600 block of Georgia Avenue had private homes, not apartment buildings, situated on it. At the suppression hearing Sergeant McGuire explained that "[o]nce inside the house, it *turned out to be* a rooming house" (emphasis added), and at trial he asserted without reference to time or place only that he "was told" that the address was a rooming house. Although McGuire also stated at the suppression hearing that he had had no difficulty entering the dwelling in the past (thus raising the inference that the occupants cared little about their privacy), his testimony leaves uncertain whether the police ever entered the house *before* the raid on June 22, 1989.[3]

Moreover, even if the police knew the residence was a rooming house, *Booth* makes clear that, without more, that is not enough to support the inference that public access was freely permitted and that the residents held no "privacy interests [in the common areas] worthy of society's protection." *Id.* at 1353. As in *Booth,* the

---

2. The judge reasoned:
   [A]lthough the matter is very close, my tentative view is that—when analyzed in light of *Booth,* ... that going through somebody's kitchen to get to the basement in a private home converted to a rooming house, that there's no indication that that kitchen and the stairway down to the basement was open to the general public.
   So I think probably that the defendant had a reasonable expectation of privacy in the

common area of that home converted to a tourist home.

3. When asked whether he recalled if he had been to the residence at 4621 Georgia Avenue before or after June 22, 1989, McGuire stated: "I know we've been to that location quite a few times, some of them could have been before and some of them could have been after."

government has not challenged appellant's assertion that he paid rent and resided in the house, and that he had "access to and [made] use of the area" through which the police proceeded before seizing him in the basement. *Id.* Also, proof of appellant's "authority to exclude others from the area entered and searched" is at least as strong as the evidence pointed to by the court in *Booth. Id.* Appellant testified that sometimes the front door was left open—as on this late June occasion—and at other times it was locked. We cannot infer merely from this that the tenants took no "reasonable precautions in attempting to maintain privacy." *Id.* Of particular importance to the trial judge was that the police passed through the front hallway *and* "through somebody's kitchen to get to the basement in [this] private home converted to a rooming house." Appellant testified that the tenants shared the use of the kitchen, and nothing in the record suggests that the residents had relinquished their authority to exclude uninvited persons from the kitchen and adjoining areas. As the trial judge stated, "[T]here's no indication that the kitchen and the stairway down to the basement [were] open to the general public."

In sum, applying *Booth,* we hold that appellant met his burden of establishing a legitimate expectation of privacy in the areas entered by the police and in which they discovered and seized him.[4]

### III.

■ Turning to the merits, we begin with the government's acknowledgment on appeal that the warrantless entry of the rooming house was not justified by exigent circumstances. Since there was also no consent to the entry, the government thus concedes that the search leading to appellant's discovery in the basement was unlawful, and that if the showup identification by Officer Walton on the sidewalk outside was "in some sense the product" of the unlawful search, *United States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1249–50, 63 L.Ed.2d 537 (1980), then testimony about the identification was wrongly admitted at trial.[5] We must decide, in other words, whether the identification was " 'come at by exploitation of [the violation of] the defendant's Fourth Amendment rights.' " *New York v. Harris,* 110 S.Ct. at 1644, quoting *Crews,* 445 U.S. at 471, 100 S.Ct. at 1250. If so, then the evidence must be suppressed.

*Harris,* on which the trial court and the government rely, involved the admissibility of an inculpatory statement made to the police at the station house after the defendant was arrested in his home without a warrant in violation of *Payton v. New York, supra.*[6] The Court began by accepting the conclusion of the lower courts that the police had probable cause to arrest Harris before entering the home. *Harris,* 110 S.Ct. at 1642. It then noted that earlier cases had rejected a " '*per se* ' or 'but for' rule" in Fourth Amendment causation analysis in favor of the principle that " 'the penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to

---

**4.** Some of the government's arguments as to the expectation of privacy a tenant, as opposed to owner, would reasonably possess seem directed to a different rental setting, *i.e.,* common areas of a large multi-unit apartment building. We express no opinion as to standing issues that might arise in that context.

**5.** In *Harris,* the Court explained that once it is shown that "the challenged evidence is in some sense the product of illegal government activity," quoting *Crews, supra,* then "attenuation analysis" may come into play applying the factors identified in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *Harris,* 110 S.Ct. at 1643. In this case the government does not attempt attenuation analysis un-

der *Brown,* with good reason. It also does not argue that the admission of the showup identification, if error, was constitutionally harmless. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**6.** In *Payton,* the Supreme Court adopted the reasoning of Judge Leventhal in *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), that, absent exigent circumstances, a warrant is necessary to arrest a person inside his home for commission of a felony because "it is inherent in such an entry that a search for the suspect may be required before he can be apprehended." *Payton,* 445 U.S. at 588, 100 S.Ct. at 1381.

serve.'" *Id.* at 1642–43 (quoting *United States v. Ceccolini,* 435 U.S. 268, 276, 279, 98 S.Ct. 1054, 1060, 1061–62, 55 L.Ed.2d 268 (1978)). The Court concluded:

> In light of these principles, we decline to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime.

*Id.* at 1643.

> The Court reasoned that
>
> [b]ecause the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings and allowed to talk. For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his door step, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.

*Id.* The Court therefore found it unnecessary to engage in "attenuation analysis" under *Brown v. Illinois, see* note 5, *supra,* because

> Harris' statement taken at the police station was not the product of being in unlawful custody. Neither was it the fruit of having been arrested in the home *rather than someplace else* ... Harris

was in legal custody, ... and ... the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house *rather than someplace else.*

*Id.* at 1644 (emphasis added).

We conclude that *Harris* differs from this case in a critical respect. The difference is that in *Harris* the discovery of the defendant inside his home contributed nothing to the evidentiary basis for detaining him. *Harris,* in essence, is a case in which the forbidden entry and search were legally irrelevant to the admissibility of the later-acquired evidence—the defendant's station house confession—because nothing flowed from the illegality. The police had probable cause to arrest Harris regardless of where they found him, and thus the legal basis for seizing him was independent of the fact he was arrested in the home rather than somewhere else. Stated another way, all the police acquired as a result of the unlawful entry was Harris's person;[7] but, as the Court had made clear previously, "[t]here could be no valid claim ... that Harris was immune from prosecution because his person was the fruit of an illegal arrest." *Id.* at 1643 (citing *Crews,* 445 U.S. at 474, 100 S.Ct. at 1251).

Unlike the situation in *Harris,* it is not true here that the police acquired nothing from the unlawful entry legally relevant to their ability to detain appellant for a showup identification. On the contrary, it is apparent that the police acquired the evidentiary basis for detaining him only by discovering him in the house as a result of the illegal search.[8] Unlike in *Harris,* it is decisive in this case that the police seized appellant "in the house rather than someplace else," *id.* at 1644, because until they

---

**7.** Harris had also made an incriminating statement in the house, but it was suppressed by the trial court and the state did not thereafter challenge that ruling. 110 S.Ct. at 1642. The Supreme Court pointed out that "anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been...." *Id.* at 1644.

**8.** Our decisions have recognized that seizing and transporting a suspect a reasonable distance for a prompt showup identification based upon articulable suspicion is permissible under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See, e.g., Muldrow v. United States,* 525 A.2d 1031, 1032 (D.C.1987); *District of Columbia v. M.M.,* 407 A.2d 698, 701 (D.C.1979). We assume, for argument's sake, that the only evidentiary basis the police needed for detaining appellant to conduct a showup identification was articulable suspicion—even though the seizure took place within "the sanctity of the home," *Payton v. New York,* 445 U.S. at 601, 100 S.Ct. at 1388.

found him there they lacked even the "minimal level of objective justification," *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984), necessary to support a detention under *Terry v. Ohio.*

Before they discovered appellant in the house, the police conducting the search knew only that a black male wearing a brown suede-like jacket and gray khaki pants had sold Officer Walton narcotics in the immediate vicinity of 4621 Georgia Avenue. Unless and until the officers found someone matching that description *in proximity to that address*, the description conveyed by Officer Walton, without more, was too general to justify seizing anyone under *Terry*. E.g., *Cauthen v. United States*, 592 A.2d 1021, 1023 & nn. 2-3 (D.C.1991); *Brown v. United States*, 590 A.2d 1008, 1017-18 (D.C.1991). Numerous males in various parts of the city might have matched that description, cf. *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) ("circumstances describ[ing] a very large category of presumably innocent travelers" insufficient to support reasonable suspicion). Thus, appellant's discovery in the immediate area of the drug sale was essential to the justification for detaining him.[9] The Supreme Court's observation in *Harris* that the exclusionary rule was appropriately applied to "anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere," 110 S.Ct. at 1644, therefore dictates the result in this case. In finding appellant in his home the police gathered the key piece of evidence—his presence in or around 4621 Georgia Avenue—necessary to detain him for the show-up identification. Because the evidentiary predicate for appellant's detention was *dependent* on the constitutional violation, the subsequent identification made during that detention must be excluded as a derivative fruit of the prior illegal entry.

The government responds that the same proof necessary to seize appellant would have been supplied *if* the police had found him on his door step rather than in the home; the government thereby seeks to avail itself of language in *Harris* that, "[f]or Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his door step, illegally entered his home to search for evidence, and later interrogated Harris at the station house." *Id.* at 1643. But the fact that the police *might* not have entered the house unlawfully, found appellant outside, and achieved the same resulting identification, does not change the fact that they *did* act unlawfully and only thereby acquired reason to detain him for the show-up. Indeed, that the former course of action would have been a lawful means of acquiring the basis for appellant's detention, while the latter is constitutionally forbidden, is precisely the reason exclusion is called for here. Unlike in *Harris* but as in *Payton*, suppressing the out-of-court identification will "serve the purpose of the rule that made [appellant's] in-house [seizure] illegal," *id.* at 1644, by denying the government "the indirect fruits of an illegal search...." *Id.* at 1643.[10]

The government concludes its argument by acknowledging that if this court reaches the *Harris* issue (*i.e.*, by finding that appellant's legitimate privacy interest was invad-

---

9. That would not be the case had Officer Walton himself encountered appellant in a distant location, given the visual imprint on his memory of a seller with whom he had met face-to-face for a significant period of time. But we do not understand the government to argue, nor could it reasonably, that the visual picture Walton had formed of his seller could be imputed to the other officers. That the arrest team was entitled to rely on the information transmitted is beyond question. See *United States v. Hensley*, 469 U.S. 221, 232-33, 105 S.Ct. 675, 682-83, 83 L.Ed.2d 604 (1985); *Haywood v. United States*, 584 A.2d 552, 557 (D.C.1990). But the scope of justifiable reliance is limited by the objective information imparted. *Hensley*, 469 U.S. at 232-33, 105 S.Ct. at 682-83; see *Haywood*, 584 A.2d at 557.

10. In *United States v. Crews, supra*, the Court refused to suppress a victim's *in-court* identification despite the defendant's illegal arrest. The Court did not question the propriety of suppressing intervening photographic and lineup identifications which the government "conceded to be suppressible fruits of the Fourth Amendment violation." 445 U.S. at 472, 100 S.Ct. at 1250; see also *id.* at 473 n. 18, 100 S.Ct. at 1251 n. 18.

ed) "and decides that [the] incentives [for the police to comply with the Fourth Amendment] would be weakened" by application of *Harris* to the present facts, then "the judgment should be reversed." This is praiseworthy candor in keeping with the Executive's special obligation to our system of justice. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). It leaves us hopeful that what the trial judge feared was a widespread practice by police in circumstances such as these [11] will be, if it has not already been, curtailed.

The judgment of the Superior Court is reversed and the case remanded with directions to exclude the identification evidence in question.

*So ordered.*

11. The judge stated from the bench:
    I've never heard of arrest teams operating this way in these drug cases. I've never had anybody go into a building before. I've talked to some colleagues at lunch, and apparently it's a widespread practice just to go right into buildings to get people, which I didn't know.