**Troy MARTIN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 90–1178.**

District of Columbia Court of Appeals.

Argued March 2, 1992.
Decided April 14, 1992.

---

John A. Briley, Jr., Washington, D.C., appointed by this court, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, STEADMAN, Associate Judge, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

This case was previously remanded to the trial court for factual findings on two issues: (1) "whether the police had probable cause to arrest [appellant] Martin" on February 3, 1983, and (2) "whether there was valid consent to enter his grandparents' home." *Martin v. United States,* 567 A.2d 896, 907 (D.C.1989).[1] On remand, the trial court made specific findings of facts and concluded that the police had probable cause to arrest Martin. It further concluded that, pursuant to *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), "the question of whether there was a valid consent to the entry of the grandparents' house to arrest [Martin] does not bar the use of [his] statement made at the station house after his removal from the grandparents' home." Accordingly, the trial court found it unnecessary to reach the question of consent, but it nevertheless concluded that the record was clear that Martin's grandparents had given their consent. Martin now challenges these findings of fact and conclusions of law as clearly erroneous. We affirm.

On remand to determine whether there was probable cause to arrest appellant Troy Martin on February 3, 1983, and whether the police entered his grandparents' house with their consent, the trial court made several general and specific findings of fact and conclusions of law. We relate here several of the court's factual findings to facilitate our review as to whether the court was wrong in concluding (a) that probable cause existed on February 3 to arrest Martin, (b) that in light of

---

1. This court directed the trial court to "rule on the basis of the existing record, or it may in its discretion hear additional testimony." No additional evidentiary hearing was held, but both parties filed memoranda, and appellant later filed a second, reply memorandum.

*Harris, supra,* 110 S.Ct. at 1640, the issue of consent was irrelevant, and (c) at any rate, Martin's grandparents had consented to the entry of the police into their home.

On January 25, 1983, Charles Randolph was murdered in his home for money. A pillow had been put over his head and a bullet fired through the pillow into the back of his head. Later that same day, an anonymous caller reported to Detective Terrell that he had witnessed two men, "Troy" and "Skeeter," at the murder scene at approximately the time of the murder. He said that the two men ran away when a police car drove by. Later, at a liquor store, he overheard "Skeeter" relating that Randolph had been shot through the back of the head through a pillow for several hundred dollars. The information that a pillow was involved had not been released by the police to the public.

In the meantime, Detective Steel recalled the names, "Troy" and "Skeeter," [2] which the anonymous caller had mentioned, and, within forty-eight hours of the murder, provided Detective Terrell with the names and addresses of Troy Martin and Skeeter Johnson. He also told Detective Terrell that Skeeter was in prison, but that his brother Benjamin closely resembled him. Meanwhile, the police were able to determine the identity of the reluctant witness,[3] and he came in for questioning on January 27, two days after the murder. At this interview, the witness described in detail to Detective Terrell that he had seen "Troy" and a man whom he thought was called "Skeeter" at the murder scene and had

overheard the revealing liquor store conversation. During the interview, the witness identified "Troy" as Troy Martin from a photographic array which included the photographs of Skeeter Johnson and Troy Martin which had been given to Detective Terrell by Detective Steel.[4] The witness also made a photographic identification of the man he had called "Skeeter" as Benjamin Johnson, who was in fact Skeeter's brother.

Later, Detective Terrell had a conversation with Sergeant Thomas discussing the evidence they had against Troy Martin and asked him to bring Martin in for questioning. Thomas misunderstood Terrell's request and, on February 3, went to the house of Martin's grandparents to arrest Martin. From its findings of facts, the trial court concluded that even though Detective Terrell did not intend for Martin to be arrested at that time, probable cause nevertheless existed to warrant his arrest on February 3.

Next, the trial court found it unnecessary to reach the question of whether there was a valid consent for the police to enter the house of Martin's grandparents to arrest him because the court considered that it was bound by the holding in *Harris, supra,* 110 S.Ct. at 1640. There, the Supreme Court held that so long as probable cause existed at the time of the arrest, a statement made by the arrested person outside his home is still admissible at trial even though the routine felony arrest was made inside the home without a warrant

**2.** Detective Steel remembered these names because Troy Martin and Skeeter Johnson were the names of the two men who had robbed his wife at gunpoint sometime earlier.

**3.** During the anonymous call, the man admitted that his brother was a member of the Metropolitan Police Department in the Fourth District. The police also deduced that the unknown witness probably lived on the same block where the murder was committed. The police read a memorandum with this information at roll call in the Fourth District. A police officer came forward, and his brother turned out to be the sought-after witness.

**4.** During the first appeal of this case, we had found the record unclear as to whether the

witness had made a photographic identification of Martin during his interview on January 27 or after Martin had been arrested on February 3. We were concerned that if the witness

did not make his photographic identification before the arrest, then it cannot be assumed that the "Troy" and "Skeeter" whom Steel knew were the same "Troy" and "Skeeter" that [the witness] knew. A photographic identification prior to the arrest would ensure that both the police and [the witness] had properly identified the same suspect. *Martin, supra,* 567 A.2d at 904 n. 18. Therefore, we remanded the case so that the trial court could make a specific finding of fact as to when the witness made the identification of Troy Martin from the photographic array, and this is now satisfactorily resolved.

and without consent to enter his home. Nevertheless, the trial court concluded that the record is quite clear and uncontradicted that appellant's grandparents consented to the police entry and specifically noted that (1) the grandparents "had been fully advised by [appellant's] mother that the police were coming" to pick up appellant and (2) after the police arrived, the grandfather knocked to the floor a relative who was giving the police a difficult time. Appellant contends that the findings of facts and conclusions of law made by the trial court are clearly erroneous and thus seeks to have his conviction vacated and a new trial ordered.

## I. PROBABLE CAUSE

■ Although we agree that there is "no fixed formula for determining the existence of probable cause," *In re E.G.*, 482 A.2d 1243, 1246 (D.C.1984) (quoting *Smith v. United States*, 435 A.2d 1066, 1068 (D.C. 1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982)), this court has repeatedly held it to exist

> when the facts and circumstances within a police officer's knowledge, of which he or she has reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed.

*Martin, supra*, 567 A.2d at 903 (citing *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Thus, a finding of probable cause depends not on certainties nor even eventual truth, but on the practical considerations of daily life on which reasonable and prudent persons, not legal experts, act. *In re E.G., supra*, 482 A.2d at 1246.

The trial court found that on February 3 the police were aware of the following facts and circumstances which amply sup-ported a finding of probable cause to arrest Martin: (1) an initially anonymous witness called the police and informed them that he had seen "Troy" and another person at the scene of the crime during the critical time and had observed them behaving suspiciously; (2) the witness had later overheard the other person describing the robbery and murder including the undisclosed fact that the victim had been shot in the head through a pillow; and (3) within two days of the murder, this witness repeated this information, in person, to the police and identified "Troy" as Troy Martin from a photographic array. Taking account of these facts which we deem to be reasonably trustworthy, we conclude that the trial court's conclusion that probable cause existed on February 3 when Martin was arrested should not be disturbed.

## II. CONSENT

■ We also remanded the case for findings by the trial court as to whether the police entered the grandparents' house with their consent. Subsequent to the remand, the Supreme Court, in *Harris, supra*, 110 S.Ct. at 1641, held that

> [W]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside his home, even though the statement is taken after an arrest made in the home in violation of *Payton* .... The rule in *Payton* was designed to protect the physical integrity of the home, not to grant criminal suspects protection for statements made outside their premises where the police have probable cause to make an arrest.[5] (Citations omitted.)

The trial court concluded that in this case it did not need to reach the issue of consent in light of the holding in *Harris*, and we agree.[6] The police arrested Martin in his

---

**5.** In *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Court had held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest.

**6.** This court, however, determined in *Bryant v. United States*, 599 A.2d 1107 (D.C.1991), that *Harris, supra*, 110 S.Ct. at 1640, does not render a subsequent showup identification admissible if it was the product of the unlawful search of the home after a nonconsensual entry by police even if probable cause to arrest exists. In *Bryant*, the police arrested a man in the com-

grandparents' home without a warrant but with probable cause. Martin made a statement to the police outside his grandparents' home, *i.e.*, at the station house. In *Harris*, as here, the "police had a justification to question [appellant] prior to his arrest." *Id.* In *Harris*, the police had no consent to enter his home, but the court, nevertheless, found that his "subsequent statement was not an exploitation of the illegal entry into his home." *Id.* In light of *Harris*, it follows that if the entry of the police into the home of Martin's grandparents had been nonconsensual, Martin's subsequent statement at the station house would nevertheless still have been admissible because it was not an exploitation of the illegal entry into his grandparents' home.

The trial court, however, went on to note that Martin's grandparents had given their consent to the police to enter their home. The court based its conclusion on the undisputed fact that the grandparents knew the police were coming to their home for their grandson. The court noted that, in fact, the grandfather had knocked down one of his relatives when he tried to interfere with the police. Accordingly, the trial court concluded that, in light of *Harris*, it was irrelevant whether the grandparents consented to the entry of the police into their home. But even if *Harris* did not apply here, the facts demonstrate that the entry was consensual. Thus, either way, Martin's statement was admissible at trial.

Accordingly, the judgment of the trial court is

*Affirmed.*

---

mon area of his boarding house without a warrant, without exigent circumstances, and without consent to enter the house. This court held that even though probable cause existed at the time of the arrest, the police acquired the evidentiary basis for detaining him only by discovering him in the house as a result of the illegal search. Stated another way, the showup identification was the tainted fruit of the unlawful entry so that the testimony about the identification was wrongly admitted at trial. In *Harris*, however, "the forbidden entry and search were legally irrelevant to the admissibility of the later-acquired evidence—appellant's station house confession—because nothing flowed from the illegality." *Bryant, supra*, 599 A.2d at 1111. In other words, all that the police acquired as a result of the unlawful entry in *Harris* was appellant's person, not the evidentiary predicate for appellant's detention as in *Bryant*. Accordingly, *Bryant* is inapposite here because we deem the facts and circumstances in the instant case to fall squarely within *Harris*.