# NEW YORK *v.* HARRIS

No. 88–1000.   Argued January 10, 1990—Decided April 18, 1990

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 21.

*Peter D. Coddington* argued the cause for petitioner. With him on the briefs were *Robert T. Johnson, Anthony J. Girese, Stanley R. Kaplan,* and *Karen P. Swiger.*

*Barrington D. Parker, Jr.,* by invitation of the Court, 492 U. S. 934, argued the cause as *amicus curiae* in support of the judgment below. With him on the brief was *Ronald G. Blum.**

JUSTICE WHITE delivered the opinion of the Court.

On January 11, 1984, New York City police found the body of Ms. Thelma Staton murdered in her apartment. Various facts gave the officers probable cause to believe that the respondent in this case, Bernard Harris, had killed Ms. Staton. As a result, on January 16, 1984, three police officers went to Harris' apartment to take him into custody. They did not first obtain an arrest warrant.

When the police arrived, they knocked on the door, displaying their guns and badges. Harris let them enter.

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Starr, Assistant Attorney General Dennis, Deputy Solicitor General Bryson, Michael R. Dreeben,* and *Robert J. Erickson;* for the Office of Prosecuting Attorney, Wayne County, Michigan, by *John D. O'Hair* and *Timothy A. Baughman;* and for Americans for Effective Law Enforcement, Inc., et al. by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Gregory U. Evans, Daniel B. Hales, George D. Webster,* and *Jack E. Yelverton.*

Once inside, the officers read Harris his rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Harris acknowledged that he understood the warnings, and agreed to answer the officers' questions. At that point, he reportedly admitted that he had killed Ms. Staton.

Harris was arrested, taken to the station house, and again informed of his *Miranda* rights. He then signed a written inculpatory statement. The police subsequently read Harris the *Miranda* warnings a third time and videotaped an incriminating interview between Harris and a district attorney, even though Harris had indicated that he wanted to end the interrogation.

The trial court suppressed Harris' first and third statements; the State does not challenge those rulings. The sole issue in this case is whether Harris' second statement—the written statement made at the station house—should have been suppressed because the police, by entering Harris' home without a warrant and without his consent, violated *Payton* v. *New York*, 445 U. S. 573 (1980), which held that the Fourth Amendment prohibits the police from effecting a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. The New York trial court concluded that the statement was admissible. Following a bench trial, Harris was convicted of second-degree murder. The Appellate Division affirmed, 124 App. Div. 2d 472, 507 N. Y. S. 2d 823 (1986).

A divided New York Court of Appeals reversed, 72 N. Y. 2d 614, 532 N. E. 2d 1229 (1988). That court first accepted the trial court's finding that Harris did not consent to the police officers' entry into his home and that the warrantless arrest therefore violated *Payton* even though there was probable cause. Applying *Brown* v. *Illinois*, 422 U. S. 590 (1975), and its progeny, the court then determined that the station house statement must be deemed to be the inadmissible fruit of the illegal arrest because the connection between the statement and the arrest was not sufficiently attenuated.

The court noted that some courts had reasoned that the "wrong in *Payton* cases . . . lies not in the arrest, 'but in the unlawful *entry* into a dwelling without proper judicial authorization'" and had therefore declined to suppress confessions that were made following *Payton* violations.   72 N. Y. 2d, at 623, 532 N. E. 2d, at 1234.   The New York court disagreed with this analysis, finding it contrary to *Payton* and its own decisions interpreting *Payton*'s scope.   We granted certiorari to resolve the admissibility of the station house statement.   490 U. S. 1018 (1989).

For present purposes, we accept the finding below that Harris did not consent to the police officers' entry into his home and the conclusion that the police had probable cause to arrest him.   It is also evident, in light of *Payton*, that arresting Harris in his home without an arrest warrant violated the Fourth Amendment.   But, as emphasized in earlier cases, "we have declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States* v. *Ceccolini*, 435 U. S. 268, 276 (1978). Rather, in this context, we have stated that "[t]he penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." *Id.*, at 279. In light of these principles, we decline to apply the exclusionary rule in this context because the rule in *Payton* was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime.

*Payton* itself emphasized that our holding in that case stemmed from the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." 445 U. S., at 601.   Although it had

long been settled that a warrantless arrest in a public place was permissible as long as the arresting officer had probable cause, see *United States* v. *Watson,* 423 U. S. 411 (1976), *Payton* nevertheless drew a line at the entrance to the home. This special solicitude was necessary because "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" 445 U. S., at 585 (citation omitted). The arrest warrant was required to "interpose the magistrate's determination of probable cause" to arrest before the officers could enter a house to effect an arrest. *Id.,* at 602–603.

Nothing in the reasoning of that case suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest. *United States* v. *Crews,* 445 U. S. 463, 474 (1980). Nor is there any claim that the warrantless arrest required the police to release Harris or that Harris could not be immediately rearrested if momentarily released. Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda* warnings, and allowed to talk. For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his doorstep, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.

This case is therefore different from *Brown* v. *Illinois,* 422 U. S. 590 (1975), *Dunaway* v. *New York,* 442 U. S. 200 (1979), and *Taylor* v. *Alabama,* 457 U. S. 687 (1982). In each of those cases, evidence obtained from a criminal de-

fendant following arrest was suppressed because the police lacked probable cause. The three cases stand for the familiar proposition that the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality. See also *Wong Sun* v. *United States*, 371 U. S. 471 (1963). We have emphasized, however, that attenuation analysis is only appropriate where, as a threshold matter, courts determine that "the challenged evidence is in some sense the product of illegal governmental activity." *United States* v. *Crews*, *supra*, at 471. As Judge Titone, concurring in the judgment on the basis of New York state precedent, cogently argued below, "[i]n cases such as *Brown* v. *Illinois (supra)* and its progeny, an affirmative answer to that preliminary question may be assumed, since the 'illegality' is the absence of probable cause and the wrong consists of the police's having control of the defendant's person at the time he made the challenged statement. In these cases, the 'challenged evidence'—*i. e.*, the post arrest confession—is unquestionably 'the product of [the] illegal governmental activity'—*i. e.*, the wrongful detention." 72 N. Y. 2d, at 625, 532 N. E. 2d, at 1235.

Harris' statement taken at the police station was not the product of being in unlawful custody. Neither was it the fruit of having been arrested in the home rather than someplace else. The case is analogous to *United States* v. *Crews*, *supra*. In that case, we refused to suppress a victim's in-court identification despite the defendant's illegal arrest. The Court found that the evidence was not "'come at by exploitation' of . . . the defendant's Fourth Amendment rights," and that it was not necessary to inquire whether the "taint" of the Fourth Amendment violation was sufficiently attenuated to permit the introduction of the evidence. 445 U. S., at 471. Here, likewise, the police had a justification to question Harris prior to his arrest; therefore, his subsequent statement was not an exploitation of the illegal entry into Harris' home.

20

We do not hold, as the dissent suggests, that a statement taken by the police while a suspect is in custody is always admissible as long as the suspect is in legal custody. Statements taken during legal custody would of course be inadmissible, for example, if they were the product of coercion, if *Miranda* warnings were not given, or if there was a violation of the rule of *Edwards* v. *Arizona*, 451 U. S. 477 (1981). We do hold that the station house statement in this case was admissible because Harris was in legal custody, as the dissent concedes, and because the statement, while the product of an arrest and being in custody, was not the fruit of the fact that the arrest was made in the house rather than someplace else.

To put the matter another way, suppressing the statement taken outside the house would not serve the purpose of the rule that made Harris' in-house arrest illegal. The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting Harris in his home, rather than elsewhere, has been excluded, as it should have been; the purpose of the rule has thereby been vindicated. We are not required by the Constitution to go further and suppress statements later made by Harris in order to deter police from violating *Payton*. "As cases considering the use of unlawfully obtained evidence in criminal trials themselves make clear, it does not follow from the emphasis on the exclusionary rule's deterrent value that 'anything which deters illegal searches is thereby commanded by the Fourth Amendment.'" *United States* v. *Leon*, 468 U. S. 897, 910 (1984) (citation omitted). Even though we decline to suppress statements made outside the home following a *Payton* violation, the principal incentive to obey *Payton* still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found, or statements taken, inside the home. If we did suppress statements like Harris', moreover, the incremental deterrent value would be minimal. Given that the police have probable cause to arrest a suspect in Harris' position, they need

not violate *Payton* in order to interrogate the suspect. It is doubtful therefore that the desire to secure a statement from a criminal suspect would motivate the police to violate *Payton*. As a result, suppressing a station house statement obtained after a *Payton* violation will have little effect on the officers' actions, one way or another.

We hold that, where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*. The judgment of the court below is accordingly

*Reversed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Police officers entered Bernard Harris' home and arrested him there. They did not have an arrest warrant, he did not consent to their entry, and exigent circumstances did not exist. An arrest in such circumstances violates the Fourth Amendment. See *Payton* v. *New York*, 445 U. S. 573 (1980); see also *ante*, at 16, 17. About an hour after his arrest, Harris made an incriminating statement, which the government subsequently used at his trial. The majority concedes that the fruits of that illegal entry must be suppressed. See *ante*, at 20. The sole question before us is whether Harris' statement falls within that category.

The majority answers this question by adopting a broad and unprecedented principle, holding that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Ante*, this page. The majority's conclusion is wrong. Its reasoning amounts to nothing more than an analytical sleight of hand, resting on errors in logic, misreadings of our cases, and an apparent blindness to the incentives the Court's

ruling creates for knowing and intentional constitutional violations by the police. I dissent.

## I

In recent years, this Court has repeatedly stated that the principal purpose of the Fourth Amendment's exclusionary rule is to eliminate incentives for police officers to violate that Amendment. See, *e. g.*, *United States* v. *Leon*, 468 U. S. 897, 906 (1984). A police officer who violates the Constitution usually does so to obtain evidence that he could not secure lawfully. The best way to deter him is to provide that any evidence so obtained will not be admitted at trial. Deterrence of constitutional violations thus requires the suppression not only of evidence seized during an unconstitutional search, but also of "derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search." *Murray* v. *United States*, 487 U. S. 533, 536–537 (1988) (citing *Nardone* v. *United States*, 308 U. S. 338, 341 (1939)); see also *Wong Sun* v. *United States*, 371 U. S. 471, 488 (1963). Not all evidence connected to a constitutional violation is suppressible, however. Rather, the Court has asked "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Ibid.* (quoting J. Maguire, Evidence of Guilt 221 (1959)). Accord, *Brown* v. *Illinois*, 422 U. S. 590, 599 (1975); *Dunaway* v. *New York*, 442 U. S. 200, 217–218 (1979); *Taylor* v. *Alabama*, 457 U. S. 687, 690 (1982).

Because deterrence is a principal purpose of the exclusionary rule, our attenuation analysis must be driven by an understanding of how extensive exclusion must be to deter violations of the Fourth Amendment. We have long held that where police have obtained a statement after violating the Fourth Amendment, the interest in deterrence does not

disappear simply because the statement was voluntary, as required by the Fifth Amendment. See, *e. g.*, *Brown, supra,* at 601–602; *Dunaway, supra,* at 216–217; *Taylor, supra,* at 690. Police officers are well aware that simply because a statement is "voluntary" does not mean that it was entirely unaffected by the Fourth Amendment violation. See *Brown, supra,* at 601–602. Indeed, if the Fourth Amendment required exclusion only of statements taken in violation of the Fifth Amendment, the Fourth Amendment would serve no independent purpose. A regime that suppresses only *some* fruits of constitutional violations is a regime that barely begins to eliminate the incentives to violate the Constitution.

When faced with a statement obtained after an illegal arrest, then, a court will have occasion to engage in the attenuation inquiry only if it first determines that the statement is "voluntary," for involuntary statements are suppressible in any event. Attenuation analysis *assumes* that the statement is "voluntary" and asks whether the connection between the illegal police conduct and the statement nevertheless requires suppression to deter Fourth Amendment violations. That question cannot be answered with a set of *per se* rules. An inquiry into whether a suspect's statement is properly treated as attributable to a Fourth Amendment violation or to the suspect's independent act of will has an irreducibly psychological aspect, and irrebuttable presumptions are peculiarly unhelpful in such a context. Accordingly, we have identified several factors as relevant to the issue of attenuation: the length of time between the arrest and the statement, the presence of intervening circumstances, and the "purpose and flagrancy" of the violation. See, *e. g.*, *Brown, supra,* at 603–604.

We have identified the last factor as "particularly" important. 422 U. S., at 604. When a police officer intentionally violates what he knows to be a constitutional command, exclusion is essential to conform police behavior to the law. Such a "flagrant" violation is in marked contrast to a violation

that is the product of a good-faith misunderstanding of the relevant constitutional requirements. This Court has suggested that excluding evidence that is the product of the latter variety of violation may result in deterrence of *legitimate* law enforcement efforts. See *Leon, supra,* at 918–920. Underlying this view is the theory that officers fear that if their judgment as to the constitutionality of their conduct turns out to be wrong, the consequences of their misjudgments may be too costly to justify the possible law enforcement benefits. Any doubt concerning the constitutionality of a course of action will therefore be resolved against that course of action. Whatever the truth of that theory,[1] the concern that officers who act in good faith will be overdeterred is nonexistent when, based on a cynical calculus of the likely results of a suppression hearing, an officer intentionally decides to violate what he knows to be a constitutional command.

An application of the *Brown* factors to this case compels the conclusion that Harris' statement at the station house must be suppressed. About an hour elapsed between the illegal arrest and Harris' confession, without any intervening factor other than the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966). This Court has held, however, that "*Miranda* warnings, *alone* and *per se,* . . . cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." *Brown, supra,* at 603 (citing *Westover* v. *United States,* decided with *Miranda* v. *Arizona, supra,* at 496–497). See also *supra,* at 22–23. Indeed, in *Brown,* we held that a statement made almost *two* hours after an illegal arrest, and after *Miranda* warnings had

---

[1] This Court has never held that an officer's good-faith misunderstanding of the law justifies the admission of unconstitutionally seized evidence except in the limited context of the officer's good-faith and objectively reasonable reliance on a facially valid warrant issued by a neutral and detached magistrate. *United States* v. *Leon,* 468 U. S. 897, 925–926 (1984). Even in that limited context, I think that suppression is required. See *id.,* at 928–960 (BRENNAN, J., dissenting).

been given, was not sufficiently removed from the violation so as to dissipate the taint.    422 U. S., at 604.

As to the flagrancy of the violation, petitioner does not dispute that the officers were aware that the Fourth Amendment prohibited them from arresting Harris in his home without a warrant.    Notwithstanding the officers' knowledge that a warrant is required for a routine arrest in the home,

> "the police went to defendant's apartment to arrest him and, as the police conceded, if defendant refused to talk to them there they intended to take him into custody for questioning.    Nevertheless, they made no attempt to obtain a warrant although five days had elapsed between the killing and the arrest and they had developed evidence of probable cause early in their investigation.    Indeed, one of the officers testifed that it was departmental policy not to get warrants before making arrests in the home.    From this statement a reasonable inference can be drawn . . . that the department's policy was a device used to avoid restrictions on questioning a suspect until after the police had strenthened their case with a confession.    Thus, the police illegality was knowing and intentional, in the language of *Brown*, it 'had a quality of purposefulness,' and the linkage between the illegality and the confession is clearly established."    72 N. Y. 2d 614, 622, 532 N. E. 2d 1229, 1233–1234 (1988) (citation omitted).[2]

---

[2] The "restrictions on questioning" to which the court refers are restrictions imposed by New York law.    New York law provides that an arrest warrant may not issue until an "accusatory instrument" has been filed against the suspect.    N. Y. Crim. Proc. Law § 120.20 (McKinney 1981). The New York courts have held that police officers may not question a suspect in the absence of an attorney once such an accusatory instrument has been filed.    *People* v. *Samuels*, 49 N. Y. 2d 218, 400 N. E. 2d 1344 (1980). These two rules operate to prohibit police from questioning a suspect after arresting him in his home unless his lawyer is present.    If the police comply with *Payton*, the suspect's lawyer will likely tell him not to say any-

In short, the officers decided, apparently consistent with a "departmental policy," to violate Harris' Fourth Amendment rights so they could get evidence that they could not otherwise obtain. As the trial court held, "No more clear violation of *[Payton]*, in my view, could be established." App. 20. Where, as here, there is a particularly flagrant constitutional violation and little in the way of elapsed time or intervening circumstances, the statement in the police station must be suppressed.

## II

Had the Court analyzed this case as our precedents dictate that it should, I could end my discussion here—the dispute would reduce to an application of the *Brown* factors to the constitutional wrong and the inculpatory statement that followed. But the majority chooses no such unremarkable battleground. Instead, the Court redrafts our cases in the service of conclusions they straightforwardly and explicitly reject. Specifically, the Court finds suppression unwarranted on the authority of its newly fashioned *per se* rule. In the majority's view, when police officers make a warrantless home arrest in violation of *Payton*, their physical exit from the suspect's home *necessarily* breaks the causal chain between the illegality and any subsequent statement by the suspect, such that the statement is admissible regardless of the *Brown* factors.[3]

---

thing, and the police will get nothing. On the other hand, if they violate *Payton* by refusing to obtain a warrant, the suspect's right to counsel will not have attached at the time of the arrest, and the police may be able to question him without interference by a lawyer. The lower court's inference that a departmental policy of violating the Fourth Amendment existed was thus fully justified.

[3] The Court has a caveat of sorts. It holds that *"where the police have probable cause to arrest a suspect,* the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton."* *Ante*, at 21 (emphasis added). But the caveat adds nothing. As the Court concedes, it is unconstitutional for the police to hold a suspect

The Court purports to defend its new rule on the basis of the self-evident proposition that the Fourth Amendment does not necessarily require the police to release or to forgo the prosecution of a suspect arrested in violation of *Payton*. *Ante*, at 18. To the Court, it follows as a matter of course from this proposition that a *Payton* violation cannot in any way be the "cause" of a statement obtained from the suspect after he has been forced from his home and is being lawfully detained. Because an attenuation inquiry presupposes *some* connection between the illegality and the statement, the Court concludes that no such inquiry is necessary here. *Ante*, at 18. Neither logic nor precedent supports that conclusion.

### A

Certainly, the police were not required to release Harris or forgo his prosecution simply because officers arrested him in violation of *Payton*. But it is a dramatic leap from that unexceptionable proposition to the suggestion that the *Payton* violation thus had no effect once the police took Harris from his home. The Court's view to the contrary appears to rest on a cramped understanding of the purposes underlying *Payton*. The home is a private place, more private than any other. An invasion into the home is therefore the worst kind of invasion of privacy. An intrusion into that sanctum is an assault on the individual's solitude and on the family's communal bonds. As we said in *Payton:*

> "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by

---

without probable cause, and any statement made during a detention for which probable cause is lacking "is unquestionably the product of [the] illegal governmental activity—*i. e.*, the wrongful detention." *Ante*, at 19. (internal quotation marks omitted; citation omitted). Thus, the Court concedes that any statement taken from a suspect who is in custody without probable cause must be suppressed, *irrespective of whether there was an antecedent* Payton *violation.*

the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" 445 U. S., at 589–590 (ellipses in original) (quoting *Silverman* v. *United States*, 365 U. S. 505, 511 (1961)).

See also *California* v. *Ciraolo*, 476 U. S. 207, 212–213 (1986) ("The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened").

The majority's *per se* rule in this case fails to take account of our repeated holdings that violations of privacy in the home are especially invasive. Rather, its rule is necessarily premised on the proposition that the effect of a *Payton* violation magically vanishes once the suspect is dragged from his home. But the concerns that make a warrantless home arrest a violation of the Fourth Amendment are nothing so evanescent. A person who is forcibly separated from his family and home in the dark of night after uniformed officers have broken down his door, handcuffed him, and forced him at gunpoint to accompany them to a police station does not suddenly breathe a sigh of relief at the moment he is dragged across his doorstep. Rather, the suspect is likely to be so frightened and rattled that he will say something incriminating. These effects, of course, extend far beyond the moment the physical occupation of the home ends. The entire focus of the *Brown* factors is to fix the point at which those effects are sufficiently dissipated that deterrence is not meaningfully advanced by suppression. The majority's assertion, as though the proposition were axiomatic, that the effects of such an intrusion *must* end when the violation ends is both

undefended and indefensible. The Court's saying it may make it law, but it does not make it true.

## B

The majority's reading of our cases similarly lacks foundation. In the majority's view, our attenuation cases are not concerned with the lingering taint of an illegal arrest; rather, they focus solely on whether a subsequently obtained statement is made during an illegal detention of the suspect. *Ante*, at 18–19 (quoting 72 N. Y. 2d, at 625, 532 N. E. 2d, at 1235 (Titone, J., concurring)). In the Court's view, if (and only if) the detention is illegal at the moment the statement is made will it be suppressed. Unlike an arrest without probable cause, a *Payton* violation alone does not make the subsequent detention of the suspect illegal. Thus, the Court argues, no statement made after a *Payton* violation has ended is suppressible by reason of the Fourth Amendment violation as long as the police have probable cause.[4]

The majority's theory lacks any support in our cases. In each case presenting issues similar to those here, we have asked the same question: whether the invasion of privacy occasioned by the illegal *arrest* taints a statement made after the violation has ended—stated another way, whether the arrest caused the statement. See, *e. g., Wong Sun*, 371 U. S., at 485–488; *Brown*, 422 U. S., at 591–592, 599, 603; *Dun-*

---

[4] The Court assures us that it does not hold "that a statement taken by the police while a suspect is in custody is always admissible as long as the suspect is in legal custody." *Ante*, at 20. Rather, such statements "would of course be inadmissible if, for example, they were the product of coercion, if *Miranda* warnings were not given, or if there was a violation of the rule of *Edwards* v. *Arizona*, 451 U. S. 477 (1981)." *Ibid.* As the majority is no doubt well aware, each of these examples constitutes a violation of the *Fifth* Amendment. But suppressing the consequences of a violation of the Fifth Amendment does nothing to deter violations of the Fourth. See, *supra*, at 23. The Court's disclaimer thus only serves to reinforce the conclusion that its ruling rests on the still-undefended premise that the effects of *Payton* violations end at the suspect's doorstep.

*away*, 442 U. S., at 217, 218; *Taylor*, 457 U. S., at 690, 694. Never before today has this Court asked whether the illegality itself was continuing at the time the evidence was secured. See *Leon*, 468 U. S., at 911 (WHITE, J., for the Court) ("In short, the 'dissipation of the taint' concept that the Court has applied in deciding whether exclusion is appropriate in a particular case 'attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost'") (citation omitted).

Indeed, such an approach would render irrelevant the first and second of the *Brown* factors, which focus, respectively, on the passage of time and the existence of intervening factors between the illegality and the subsequently obtained statement. If, as the majority claims, the *Brown* analysis does not even *apply* unless the illegality is ongoing at the time the evidence is secured, no time would ever pass and no circumstance would ever intervene between the illegality and the statement.

The only Supreme Court case in which the majority even attempts to find support is *United States* v. *Crews*, 445 U. S. 463 (1980). *Crews*, however, is inapposite. In that case, the defendant moved to suppress a witness's in-court identification of him on the ground that he had been illegally arrested. Crews' theory was that he was the fruit of his own illegal arrest—that he himself should have been "suppressed." Because no identification of him could have been made if he were not in the courtroom, his argument proceeded, that identification had to be suppressed in turn. The Court rejected Crews' argument:

> "Insofar as [Crews] challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. The exclusionary

> principle of *Wong Sun* and *Silverthorne Lumber Co.* [v. *United States*, 251 U. S. 385 (1920),] delimits what *proof* the Government may offer against the accused at trial, closing the courtroom door to *evidence* secured by official lawlessness. [Crews] is not himself a suppressible 'fruit,' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct." 445 U. S., at 474 (citations omitted; footnote omitted; emphases added).

Seen in context, the majority's misuse of *Crews* is apparent. As in *Wong Sun*, *Brown*, and *Taylor*, Harris seeks to suppress *evidence*—a statement he made one hour after his arrest. He does not contend that he cannot be tried because he was arrested illegally, nor does he in any way link his demand for suppression of his statement to a claim that his presence at trial, or anywhere else, should somehow be suppressed. *Crews* is therefore irrelevant. The only authority the majority cites that directly supports its novel view of *Brown* is a concurring opinion in the New York Court of Appeals, *ante*, at 19, which is hardly a sufficient basis on which to reject almost 30 years of cases.

### C

Perhaps the most alarming aspect of the Court's ruling is its practical consequences for the deterrence of *Payton* violations. Imagine a police officer who has probable cause to arrest a suspect but lacks a warrant. The officer knows if he were to break into the home to make the arrest without first securing a warrant, he would violate the Fourth Amendment and any evidence he finds in the house would be suppressed. Of course, if he does not enter the house, he will not be able to use any evidence inside the house either, for the simple reason that he will never see it. The officer also knows, though, that waiting for the suspect to leave his house before arresting him could entail a lot of waiting, and the time he

would spend getting a warrant would be better spent arresting criminals. The officer could leave the scene to obtain a warrant, thus avoiding some of the delay, but that would entail giving the suspect an opportunity to flee.

More important, the officer knows that if he breaks into the house without a warrant and drags the suspect outside, the suspect, shaken by the enormous invasion of privacy he has just undergone, may say something incriminating. Before today's decision, the government would only be able to use that evidence if the Court found that the taint of the arrest had been attenuated; after the decision, the evidence will be admissible regardless of whether it was the product of the unconstitutional arrest.[5] Thus, the officer envisions the following best-case scenario if he chooses to violate the Constitution: He avoids a major expenditure of time and effort, ensures that the suspect will not escape, and procures the most damaging evidence of all, a confession. His worst-case scenario is that he will avoid a major expenditure of effort, ensure that the suspect will not escape, and will see evidence in the house (which would have remained unknown absent the constitutional violation) that cannot be used in the prosecution's case in chief. The Court thus creates powerful incentives for police officers to violate the Fourth Amendment. In the context of our constitutional rights and the sanctity of our homes, we cannot afford to presume that officers will be entirely impervious to those incentives.

I dissent.

---

[5] Indeed, if the officer, as here, works in New York State, the Court's assertion that "[i]t is doubtful therefore that the desire to secure a statement from a criminal suspect would motivate the police to violate *Payton,*" *ante,* at 21, takes on a singularly ironic cast. The court below found as a matter of fact that the officers in this case had intentionally violated *Payton* for *precisely* the reason the Court identifies as "doubtful." See n. 2, *supra,* and accompanying text.