Glen MURRAY, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 240, 2011.

Supreme Court of Delaware.

Submitted: April 17, 2012.
Decided: May 14, 2012.
Corrected: July 10, 2012.

Nicole M. Walker, Office of the Public Defender, Wilmington, DE, for appellant.

Morgan T. Zurn, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices constituting the Court en Banc.

STEELE, Chief Justice, for the majority:

Three officers completed a traffic stop along with the ancillary, permissible inquiries. Then, a probation officer continued to question one of the car's passengers, a probationer, even though the officer testified he had no reasonable suspicion of criminal activity. An officer who pulls a car over for speeding does not thereby gain free rein to ask as many questions, for as long a time, as he might wish. Further investigation requires further justification. Because the officer lacked reasonable suspicion, we reverse the trial judge's denial of a motion to suppress the drugs discovered in Murray's bag. Murray's continued detention constituted an impermissible seizure, and the questioning itself violated even the limited rights possessed by a probationer.

## FACTS

Detective Samuel Smith, driving an unmarked car, approached the intersection of 30th Street and Jefferson Street. Smith saw two men who were talking turn their heads quickly toward his car, they "became nervous," and one of them walked away and the other climbed into a car. Although Smith later testified that people in the neighborhood commonly recognized his car and called out to one another to announce the presence of a police officer, he noticed no one so call out on that day. Smith did not see any hand-to-hand transaction, nor did he see the person who entered the car carry anything. In short, Smith saw a person look at him and then get in a car. Smith rounded the block, and testified that the car had sped off. Because Smith's car lacked emergency lights, he called on the radio for assistance.

On I–95, a car driven by Wilmington Police Officer Matthew Hazzard, and also containing Probation Officer Daniel Collins, located a car resembling the one described on the radio. After following the car to verify that it was speeding, Hazzard pulled over the car. Smith soon arrived on the scene.

Smith approached the driver and obtained the identity of the driver, Jacqueline Owens, and the backseat passenger, Kenyattia Graham. Probation Officer Collins approached the passenger's side and obtained Glen Murray's identification. While testifying, Smith admitted the three were, by that time, focused on investigating drug activity:

Q. And at that point when you compelled them to give information, you

were investigating what at that time?

A. Drug-related activity, what I believed to be drug-related activity.

Q. You were investigating drug—related activity based solely on the fact they were in an area you knew to be a high-crime area, correct?

A. Correct.

Q. Despite the fact you had not seen any drug activity, correct?

A. Correct.

Q. You are yet still investigating drug activity?

A. Yes.[1]

This purpose does not surprise; all three officers participated in Operation Safe Streets. Collins ran the three names through DELJIS, and learned that Owens owned the car, Murray was on Level II probation, and the backseat passenger, Graham, had an outstanding capias. After the DELJIS search, the officers gave Owens a verbal reprimand instead of a ticket. Although the officers knew Graham had an outstanding capias, but they did not ask him to step out, pat him down, or arrest him. Instead, in keeping with the motivation for the stop, Collins continued looking for drugs.

Collins returned to Owens' car, and "[d]ue to the fact Mr. Murray was on Level II probation, [Collins] asked him to step out of the car so [he] could perform a pat down" to see if he had anything illegal.[2] Collins testified: "[Murray] was on probation. We were doing a check, basically, to see if there is anything illegal, officer safety. He was leaving a drug area. He is on probation for drugs."[3]

1. Violation of Probation Tr. at 22 (Del.Super. Nov. 10, 2010).

2. Suppression Hearing Tr. at 39 (Del.Super. Jan. 21, 2011).

3. *Id.* at 38.

But Collins admitted he had no reason to think Murray was dangerous.[4] Collins did not find anything during the pat down, and he did not restrain Murray or put him in handcuffs. Collins then asked Murray if a bag on the front floor of the car, on Murray's side, belonged to him, even though Collins admitted he had no reason to believe the car contained anything illegal:

Q. Anything in that pat-down that led you to believe that there may be drugs in the car?

A. No.

Q. Anything you observed from the moment you saw them to the time in which you did the pat-down that led you to believe that there was any drug activity?

A. No.

Q. And after the pat-down, you still had no reason to believe there was any drug activity?

A. Correct.

Q. So you decided, "I'm going to continue searching?"

A. Correct.

Q. Searching for what?

A. Anything illegal.

. . . .

Q. When you asked about the bag, did you have any reason to believe that drugs would be in the bag?

A. No.

Q. And when you asked Ms. Owens for permission to search the bag, did you have any reason to believe that drugs would be in the bag?

A. No.

Q. Did you have any reason to believe that there would be illegal activity in the car when you asked to search?

A. No. At the time, no.[5]

## STANDARD OF REVIEW

We review the Superior Court's denial of a motion to suppress for abuse of discretion, but review questions of law *de novo*.[6]

## ANALYSIS

■ After police officers finish a traffic stop, they cannot continue to detain a car for the purpose of asking questions without reasonable suspicion of criminal behavior.

■ The permissible duration of a traffic stop depends on the reason the police officer pulls the car over. "The duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop."[7] This rule grows out of the United States Supreme Court's explanation of a broader Fourth Amendment principle: "An investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."[8] As this Court said in *Caldwell,* "[A]ny investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop consti-

---

4. A40.

    Q. For officer safety would mean that he is likely to possess, maybe, a weapon or something. So you had no idea that there was any issue of officer safety when you pulled him out, would you agree with me?
    A. Right.
    Prob. Tr. at 38.

5. Suppr. Tr. at 45–47.

6. *Loper v. State,* 8 A.3d 1169, 1172 (Del.2010) (citing *Sierra v. State,* 958 A.2d 825, 828 (Del. 2008); *Woody v. State,* 765 A.2d 1257, 1261 (Del.2001)).

7. *Caldwell v. State,* 780 A.2d 1037, 1047 (Del. 2001).

8. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

tutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion." [9]

■ Courts conduct a full inquiry into the facts to determine whether the officer conducted his investigation reasonably:

Even where the traffic stop is not formally terminated by the issuance of a citation or warning, "the legitimating *raison d'etre* [of the stop may] evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation." Whether a given detention is "unreasonably attenuated" necessarily involves a fact-intensive inquiry in each case. [10]

■ In this case, the police pulled a car over on the basis that it was speeding. As one of the officers testified, the purpose of the stop was to investigate drug activity, but under the Fourth Amendment of the United States Constitution, the police may of course pull over a vehicle for breaking the law, even if the officers harbor a different subjective motivation. [11] The officer's power to detain the car evaporated after the officers ended the investigation that provided the objective justification for the stop. At that time, the officers had no authority to continue detaining the car, and, admittedly, no reason to suspect that Murray possessed contraband.

■ Not only did none of the officers have reasonable suspicion that Murray had

drugs, but they also lacked reasonable suspicion that any person in the car had drugs. We have held a person's decision to leave an area upon sighting police is not, in itself, suspicious. [12] In addition, our precedent distinguishes between graduated levels of flight evidence. A person's unprovoked flight from *uniformed* officers may, together with other factors, give police a reasonable suspicion of criminal activity. [13] But ambiguous furtive gestures, such as the claim that two men appeared nervous, do not. [14] Ambiguous furtive gestures include "ducking back and forth, [while] looking back at [an officer in an unmarked car]." [15]

This case, then, involves baseless police investigation after the conclusion of a traffic stop. The dissent nevertheless defends this continuing investigation, describing it as a *de minimis* intrusion. The first problem with this conception is that the relevant United States Supreme Court precedent focuses on whether police extended the traffic stop's duration "measurably," not on whether police extend the stop "significantly" or "substantially." In *Arizona v. Johnson*, the Court said that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of a traffic stop." [16] In *Johnson*,

9. *Caldwell*, 780 A.2d at 1047 (collecting cases from Maryland and Colorado supporting this rule).

10. *Id.* at 1047.

11. *See Whren v. U.S.*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.").

12. *See Cummings v. State*, 765 A.2d 945, 949 (Del.2001).

13. *See Woody v. State*, 765 A.2d 1257, 1262–66 (Del.2001).

14. *See id.*

15. *McNulty v. State*, 655 A.2d 1214, 1218 (Del. 1995).

16. *Arizona v. Johnson*, 555 U.S. 323, 333–34, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009).

the Court permitted an officer who suspected criminal activity on the strength of gang clothing, tattoos, and the presence of a police scanner radio to perform a protective patdown at the start of a traffic stop. That is, the 'unrelated matters,' in *Johnson*, were not matters that the officer dealt with *after* the traffic stop, but measures taken for self-protection at the very start of the traffic stop. None of the officers in this case spotted items in the car that provided a reasonable basis to think the car's occupants posed a threat, nor did they conduct protective patdowns at the start of the encounter.

Even if *Johnson* established a broadly applicable test permitting the police to investigate as they wish in every traffic stop so long as they do not "measurably extend" the stop, police actions here fail that test. For something to be measurable, it need not be large; the Court could have used the terms 'significantly' or 'substantially' if they intended to proscribe only an extension of a comparatively large period of time. But the United States Supreme Court attaches importance to the question of whether the additional investigation lengthened the stop at all. In *Muehler v. Mena*, a case relied on by *Johnson*, the Court took pains to point out that the officers did not need reasonable suspicion to continue questioning precisely because "the Court of Appeals did not hold that the detention was prolonged by the questioning."[17]

This case resembles a case decided by the Ohio Supreme Court, *State v. Robinette*.[18] In *Robinette I*, a drug interdiction officer stopped Robinette for speeding, checked his license, asked him to step out of his car, turned on the cruiser's video camera, and then gave him a verbal warning.[19] The officer returned Robinette's license and told him he was free to go.[20] Robinette "felt" he was free to go, but the officer asked him if he had contraband in the car.[21] Specifically, the officer said: "One question *before you get gone:* are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?"[22] Robinette denied having anything illegal, but the officer asked to search his car.[23] Robinette nodded his head in consent to the search because he did not believe he had liberty to withhold it.[24] The officer found a small amount of marijuana and a methamphetamine pill.[25] The Ohio Supreme Court found Robinette's consent given involuntarily because the officer failed to inform Robinette he could leave before the officer requested leave to search.[26]

After the Ohio Supreme Court first ruled on the case, the United States Supreme Court considered it.[27] Our nation's Court with final word on the U.S. Consti-

---

17. *Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299 (2005).

18. *State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995).

19. *See id.* at 696.

20. *Id.* at 698.

21. *Id.* at 696, 698.

22. *Id.* (emphasis added).

23. *Id.*

24. *Id.* at 698; *but see id.* at 699 (Sweeney, J., dissenting).

25. *Id.* at 696 (majority opinion).

26. *Id.* at 697 ("We also use this case to establish a bright-line test, requiring police officers to inform motorists that their legal detention has concluded before the police officer may engage in any consensual interrogation.").

27. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (*Robinette II*).

tution remanded the case, stating that Ohio went too far by suggesting the search could only be voluntary, after a traffic stop, if the police officer first told Robinette he was free to go. Instead, the Supreme Court stated that the voluntariness of the search can only be determined by a factual inquiry into all of the circumstances, and remanded the case for consideration based on that legal standard.[28]

On remand, the Ohio Supreme Court held the officer illegally seized Robinette. The officer's command to step out of the car was objectively justified for officer safety in a routine traffic stop, but the stop's justification ended when the officer returned Robinette's license.[29] Ohio's Supreme Court did not suggest the officer violated Robinette's rights by asking if Robinette had contraband.[30] The public policy of suppressing illegal drug traffic justified the minimal intrusion of extending Robinette's seizure.[31] But, after asking Robinette whether he had contraband, the officer did not gain articulable suspicion to justify further extending Robinette's seizure by asking to search his

car.[32] The Court summarized the rule as follows:

> When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure.[33]

Because the stop's justification and purpose ended when the officer returned Robinette's license, and the officer did not gain articulable suspicion while extending the stop in the public interest, the Court held the officer illegally seized Robinette when he asked for consent to search his car.[34]

Although the officer told Robinette he was "free to go," and Robinette "felt free to leave," the officer prefaced the first question with "before you get gone," which implied he was not free to leave.[35] The officer had a superior position of authority

---

28. *Id.* at 40, 117 S.Ct. 417 ("The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances. The Supreme Court of Ohio having held otherwise, its judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion").

29. *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762, 767 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)) (*Robinette III* ).

30. *Id.* at 767–68 (citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). In *Florida v. Royer*, the Court held that questioning a person on the street or in a public place who was not in custody was not a "seizure" triggering

Fourth Amendment protection. *Id.* (discussing *Royer* ). In *Brown v. Texas*, the Court held a sobriety checkpoint was not an unreasonable seizure if the intrusion was minimal and the seizure served the public interest. *Id.* (discussing *Brown* ).

31. *Id.* at 768. The *Robinette III* Court cited *Royer* for the proposition that suppressing illegal drug traffic was a public interest. *Id.*

32. *Id.* at 768–69 (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Henry v. United States*, 361 U.S. 98, 102–04, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)).

33. *Id.* at 763, 768.

34. *Id.* at 768.

35. *Id.* (quoting excerpts from a transcript).

and could have arrested Robinette if he did not cooperate.[36] In this context, Robinette "just automatically said yes" to the search because he did not believe he could refuse the officer.[37] He "merely submitted to 'a claim of lawful authority' rather than consenting as a voluntary act of free will."[38] Because Robinette's consent did not validate the illegal seizure, the search was illegal.[39]

■ In this case, Collins began an investigation of Murray because Murray was on probation that was separate and apart from the speeding stop. Murray's statement that the bag contained drugs does not preclude a finding that searching him and the car violated Murray's Fourth Amendment rights. When a person is illegally detained before he purports to give consent, his consent may not be sufficient to cleanse the illegal detention's taint.[40] The fact that a different person attempted to intervene does not change the analysis; in either case it is the officer's act of asking the question that violates the citizen's rights.

In this case, the record contains absolutely no evidence that Murray consented to his detention, pat down, or questioning.[41] In fact, it contains no evidence that Collins asked for Murray's consent to pull him out of the car. The question of whether Owens' consent was voluntary is irrelevant, because the record clearly indicates Collins questioned her about the bag only

after he illegally detained Murray, patted him down, and questioned him. The Ohio Supreme Court warned, in *Robinette III:*

> The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.[42]

In this case, however, the transition was blunt: Collins asked Murray to step out of the car so Collins could pat him down. This case should be easier to decide than *Robinette.* In *Robinette,* the officer told Robinette he was free to go before he began questioning him, and Robinette admitted that he felt free to go.[43] By contrast, Collins ordered Murray to step out of the car and patted him down before asking about the bag.

■ A separate, independent argument justifies reversal. Under Delaware Probation and Parole Procedure 7.19, and our precedent in *Sierra v. State* and *Culver v. State,* probation officers must have a reasonable suspicion of illegal activity to seize or search a probationer. Therefore, our law does not permit suspicionless probationer searches. The officers here repeatedly admitted they had no reason to suspect Murray was involved in illegal ac-

---

36. *Id.* at 771.

37. *Id.* at 770–71 (quoting excerpts from a transcript).

38. *Id.* at 771 (citing *Royer,* 460 U.S. at 497, 103 S.Ct. 1319, for the proposition that submission is not sufficient for consent).

39. *Id.* at 768–69, 771–72.

40. *See Caldwell,* 780 A.2d at 1052 n. 40 (citing cases in which a person gave consent, but the

consent was insufficient to cleanse the illegal detention's taint).

41. *See Caldwell,* 780 A.2d at 1047; *see id.* at 1052 (citing cases in which a person gave consent, but the consent was insufficient to cleanse the illegal detention's taint).

42. *See Robinette III,* 685 N.E.2d at 770–71 (internal quotation marks omitted).

43. *See id.* at 770.

tivity, admitted they did not have an officer safety concern, and explicitly asserted they could conduct a suspicionless probationer search. Therefore, when Collins asked Murray to step out of the car, he violated Murray's Fourth Amendment rights.

■ A probation officer must have a reasonable suspicion or reasonable grounds to justify an administrative search of a residence or car.[44] Nevertheless, this Court considers probation officers to have acted reasonably so long as they substantially comply with Delaware Department of Corrections regulations.[45]

The DOC regulation applicable to probation officers' detentions and searches is Probation and Parole Procedure 7.19.[46] Under Procedure 7.19, probation officers may detain any positively identified probationer to determine the nature of his activity and whether he is complying with the conditions of probation. A "detention" means temporarily depriving a person of his freedom to depart the area *based on reasonable suspicion*.[47] But they "may not detain any other individual abroad unless there are *reasonable grounds to suspect* that the person is committing, has committed or is about to commit a crime."

■ Therefore, Delaware case law and administrative law do not permit suspicionless probationer searches, even though probationers sign waivers as a condition of probation.[48] In *Sierra v. State* and *Culver v. State*, we invalidated probation officers' searches when, considering Procedure 7.19, the officers did not have reasonable suspicion from informant tips.[49] Unlike *Culver*, in which the majority and dissent disputed whether independent grounds existed for reasonable suspicion, as explained *supra*, the officers in this case did not have *any* grounds to infer a reasonable suspicion against Murray for drug activity.[50]

## CONCLUSION

The Superior Court's judgment denying the motion to suppress is reversed.

RIDGELY, Justice, dissenting:

The majority holds that the contraband must be suppressed based on the officers' treatment of Murray, a passenger. The majority sidesteps the fact that the officers' patdown and questioning of Murray did not result in the discovery of the evidence Murray sought to suppress. Rather, Owens, the driver, provided valid consent to search a bag she claimed as hers during a lawful detention for a speeding

---

44. *See Pendleton v. State*, 990 A.2d 417, 419–20 (Del.2010) (affirming a conviction in the context of a residential search); *Sierra v. State*, 958 A.2d 825, 828–29 (Del.2008) (reversing a conviction because a probation officer lacked reasonable suspicion to justify an administrative search of a residence); *Culver v. State*, 956 A.2d 5, 10–15 (Del.2008) (reversing; residential search); *Donald v. State*, 903 A.2d 315, 318–19 (Del.2006) (affirming; residential search); *Fuller v. State*, 844 A.2d 290, 292 (Del.2004) (per curiam) (affirming; car search).

45. *Pendleton*, 990 A.2d at 420; *Fuller*, 844 A.2d at 292–93.

46. Department of Correction, Bureau of Community Corrections, Probation and Parole, Proce-

dure 7.19, Arrests, Searches and Arrest–Search Checklist; *see Culver*, 956 A.2d at 10–11 (listing specific procedures); *accord Sierra*, 958 A.2d at 828–29 (same). The Department wrote Procedure 7.19 under the authority granted by 11 *Del. C.* § 4321.

47. *See* 11 *Del. C.* § 1902.

48. *Sierra*, 958 A.2d at 829.

49. *See Sierra*, 958 A.2d at 832; *Culver*, 956 A.2d at 15.

50. *Compare Culver*, 956 A.2d at 9, 14–15, *with id.* at 17–19.

violation. Owens' consent satisfies the requirements of the Fourth Amendment and Department of Correction Probation and Parole Procedure 7.19, as does Murray's later, spontaneous admission that the bag was his and that it had drugs inside it. I would affirm the denial of Murray's motion to suppress.

### Facts and Procedural History

Detective Smith was on patrol in downtown Wilmington when he observed a Chrysler travel eight blocks at approximately forty-five or fifty miles per hour in a twenty-five mile-per-hour zone. Smith called for assisting units to respond because his vehicle was not equipped with emergency lights. Smith testified that, during that call, he reported a car leaving 30th Street and Jefferson Street at a high rate of speed. At the time, Officer Collins was driving with Wilmington Police Officer Hazzard, also as part of Operation Safe Streets. Collins testified that he and Hazzard received a call from Smith reporting a vehicle leaving a possible drug activity area at a high rate of speed. Hazzard testified that Smith reported only a speeding violation. Collins and Hazzard caught up to the vehicle on Interstate 95 and pulled it over. The car had been traveling at approximately seventy miles per hour in a fifty-five mile-per-hour zone.

Hazzard approached the Chrysler on the driver's side and Collins approached on the passenger's side. Murray was in the passenger's seat, Kenyattia Graham was in the back seat, and Owens was in the driver's seat. Collins asked everyone in the car for identification, which they provided. Collins then returned to the police vehicle to conduct a criminal history check on DELJIS, which disclosed that Murray was actively on Level II probation and that a capias was out on Graham. Collins esti-mated that only five to six minutes elapsed between the time he received the identification and the time he completed the background check.

Collins returned to Owens' car, and asked Murray to step out. Hazzard testified that Graham was also asked to step out of the vehicle. Collins then conducted a patdown of Murray, which did not produce any contraband or weapons. Collins also observed a bag that had been between Murray's legs in the passenger seat. Collins asked Murray if the bookbag was his. Murray denied that it was. Collins then asked Owens if it was her bookbag. She said that it was. Collins testified to the following exchange with Owens:

Q. After she told you it was hers, what did you do?

A. I asked her if she wouldn't mind if I took a look inside since it was in front of Mr. Murray's legs in the car.

Q. And what did she say?

A. She said I could.

Q. Did you go to do that?

A. Yes.

Q. Did anything happen while you were going to open that book bag and take a look inside of it?

A. As I was attempting to grab it to check, Mr. Murray, who was standing outside the car, said: 'Hold on. It's mine. I have drugs inside.' [51]

After Murray's interjection, Collins searched the bag and found cocaine and heroin in it. Collins then called his supervisor and obtained approval to arrest Murray and perform an administrative search of Murray's residence.

Murray moved to suppress the contraband found during the search. Viewing the testimony in the light most favorable to the State, the Superior Court denied the

---

51. Suppression Hearing Tr. at 41 (Del.Super. Jan. 21, 2011).

motion. The Superior Court concluded that the traffic stop was not complete at the time that Collins requested Owens' consent to search, explaining that "[t]his is not a situation where at the end of the road I've given you your license and registration and insurance back, everything is fine, and then I try to continue on the investigation in some manner."[52] The Superior Court then concluded that Owens provided valid consent to search. Thus, the search was proper in light of the driver's consent, and also Murray's admission.

### Analysis

The majority concludes that the officers finished the traffic stop, and then continued to detain the car to investigate Murray and ask questions about the bag without reasonable suspicion of criminal activity. This continued detention, the majority holds, was unlawful and provides a basis for suppressing the contraband.

Owens' consent to search, not the patdown and questioning of Murray, led to the discovery of contraband in this case. The record and the Superior Court's findings, viewed in the light most favorable to the State, indicate that the traffic stop was not complete at the time that Owens provided consent. The record further supports that Owens' consent was voluntary, and was not the product of the patdown and questioning of Murray. Because Owens provided a valid consent to search during the scope of a lawful traffic stop,

the contraband was admissible at Murray's trial.

We held in *Caldwell v. State* that a traffic stop must be justified from the outset by a reasonable suspicion of criminal activity and that the investigation must be reasonably related in scope to the stop's initial justification to comport with the Fourth Amendment.[53] We further held that a traffic stop may be extended beyond the scope of its initial justification if "the driver voluntarily consents to further questioning or the officer uncovers facts that independently warrant additional investigation."[54] After we decided *Caldwell*, however, the U.S. Supreme Court issued a series of opinions that provide further guidance on when an officer may pursue inquiries beyond the traffic stop's initial purpose. In *Muehler v. Mena*, the Court held that officers can ask a lawfully detained person for consent to search—even if the officers have no basis for suspecting that person of criminal activity.[55] In *Arizona v. Johnson*, the Court applied *Muehler* in the context of a traffic stop.[56] There, the Court held: "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, *so long as those inquiries do not measurably extend the duration of the stop.*"[57] Thus, under *Johnson*, questions unrelated to the initial justification for the stop do not *per se* require either reasonable articulable suspicion or consent to further questioning.[58]

52. *Id.* at 87.

53. 780 A.2d 1037, 1045–46 (Del.2001).

54. *See id.* at 1047–48.

55. *Muehler v. Mena*, 544 U.S. 93, 100–01, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).

56. *Arizona v. Johnson*, 555 U.S. 323, 333–34, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

57. *Id.* at 333, 129 S.Ct. 781 (emphasis added) (citing *Mena*, 544 U.S. at 100–01, 125 S.Ct. 1465).

58. Several federal court decisions after *Muehler* and *Johnson* also instruct that inquiries unrelated to the traffic stop's initial purpose are not *per se* unreasonable where the temporal extension of the stop is *de minimis*. *See, e.g., United States v. Harrison*, 606 F.3d 42, 45 (2d Cir.2010) (per curiam) (holding that ques-

In this case, it is undisputed that the officers had a lawful justification for the initial traffic stop of Owens' vehicle, because they witnessed Owens commit a speeding violation. Collins' questions about who owned the bag and his request for consent to search did not "measurably extend" the stop under *Johnson* so as to require independent reasonable suspicion or a voluntary consent to questioning. Collins asked one question each to Murray and Owens—whether he or she owned the bag—and then requested consent to search from Owens. Collins testified that it took five to six minutes to check their identification, and the record provides no basis to conclude that the patdown of Murray and the inquiries about the bag measurably extended the length of the stop beyond this time. Moreover, the Superior Court found that the stop was *not* complete at the time of the questioning.[59] Owens was lawfully detained as part of the traffic stop when Collins asked for her consent.

In response to Collins' questions, Owens identified the bookbag as hers and consented to its search. The voluntariness of a party's consent is a question of fact that is determined by an evaluation of the totality of the circumstances.[60] Although relevant to the analysis, an officer's failure to advise a lawfully-seized person that she is "free to go" does not, of itself, preclude the officer from obtaining a voluntary consent to search.[61] Generally, consent obtained during a lawful detention with "no signs of coercion or duress" will be deemed voluntary.[62] Here, the Superior Court credited Collins' testimony as to his exchange with Owens, the driver, and concluded that Owens' consent to search was voluntary. The Superior Court determined that Owens' consent was valid after considering the totality of the circumstances.

The majority states that "the question of whether Owens' consent was voluntary is irrelevant, because the record clearly indicates Collins questioned her about the bag

---

tioning of driver and passengers about their travel plans did not give rise to unlawful detention where stop was initiated for lawful purpose and lasted mere five to six minutes); *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir.2010) (holding that officers' request for consent to search vehicle during stop for seatbelt violation did not violate Fourth Amendment where there was no evidence that stop was unreasonably prolonged), *cert. denied,* —— U.S. ——, 130 S.Ct. 3485, 177 L.Ed.2d 1076 (2010); *see also United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir.2007) (holding that, after *Muehler*, "[t]he correct Fourth Amendment inquiry (assuming the detention is legitimate) is whether an officer's traffic stop questions 'extended the time' that a driver was detained, regardless of the questions' content"). These courts have rejected the kind of bright-line, no-prolongation rule suggested by the majority opinion. *U.S. v. Everett*, 601 F.3d 484, 491 (6th Cir.2010) ("[T]he overwhelming weight of authority militates against a bright-line 'no prolongation' rule."). The majority also suggests that there is some meaningful distinction between the term

"measurably" and "significantly" or "substantially" under *Johnson*. But, as the Sixth Circuit noted in an application of *Johnson*, another definition of the word "measurable" is "significant." *Id.* (citing Webster's Third New International Dictionary Unabridged (1981) at 1399).

**59.** Suppression Hearing Tr. at 87 (Del.Super. Jan. 21, 2011) ("This is not a situation where at the end of the road I've given you your license and registration and insurance back, everything is fine, and then I try to continue on the investigation in some manner.")

**60.** *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Velasquez*, 885 F.2d 1076, 1081–82 (3rd Cir.1989).

**61.** *See Ohio v. Robinette*, 519 U.S. 33, 39–40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

**62.** *See United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir.1997); *Bustamonte*, 412 U.S. at 228, 93 S.Ct. 2041.

only after he illegally detained Murray, patted him down, and questioned him." But, the mere fact that the officers began their inquiry with Murray does not, standing alone, render involuntary—or irrelevant—the consent Owens gave to a search of a bag she said was hers.

Under the fruit of the poisonous tree doctrine, consent to search may be invalid if it follows an unlawful seizure of the person giving the consent.[63] For the doctrine to apply, however, there must first be some causal connection between the unlawful search or seizure and the consent to search.[64] Where some causal connection exists, the attenuation analysis set forth by the U.S. Supreme Court in *Brown v. Illinois* may still render the consent valid.[65] The U.S. Supreme Court has also made clear that "attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity."[66]

Here, it is not necessary to reach the attenuation analysis because there is no prior illegality relating to Owens. She was neither searched nor unlawfully detained prior to the request for consent. Collins' questioning of Owens about the bag was permissible, even though it was unrelated to the purpose of the traffic stop, under *Johnson*. Even if we were to assume that the patdown and questioning of Murray was unreasonable, the record supports the Superior Court's conclusion that Owens consented voluntarily to the search of the bag, in the course of a lawful traffic stop for speeding.

There is another reason the officer could proceed with the search. Before Collins opened the bag, which Owens said was hers, Murray interjected that it was his bag and contained drugs. Murray's admission—*which was not in response to any question asked of him*—provided Collins with probable cause to search the bag.[67] At this point there were conflicting claims of ownership, which the officer was not required to resolve. Whether the search was based upon Owens' consent or Murray's admission, the search was reasonable and did not violate Murray's rights under the Fourth Amendment.

The majority also relies on Department of Corrections Probation and Parole Procedure 7.19 as an independent basis for reversing the decision of the Superior Court. Under Procedure 7.19, probation officers may not detain an individual abroad "unless there are reasonable grounds to suspect that the person is committing, has committed or is about to commit a crime." A traffic stop results in a seizure of the passengers as well as the

---

63. *See Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Green*, 111 F.3d 515, 521 (7th Cir.1997).

64. *See Wong Sun v. U.S.*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Lopez–Vazquez v. State*, 956 A.2d 1280, 1291–93 (Del.2008).

65. *Lopez–Vazquez*, 956 A.2d at 1293 (citing *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

66. *New York v. Harris*, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). *See also*

*United States v. Crews*, 445 U.S. 463, 471, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980).

67. *State v. Maxwell*, 624 A.2d 926, 930 (Del. 1993) (stating that probable cause requires only facts which suggest, when viewed under totality of the circumstances, "that there is a fair probability that the defendant has committed a crime"). Moreover, a probation officer only needs "reasonable suspicion" of illegal conduct to conduct a warrantless search of a known probationer. *See Jacklin v. State*, 2011 WL 809684, at *2, 16 A.3d 938 (Del. Mar. 8, 2011) (TABLE).

driver,[68] and that initial detention was not unlawful here because the vehicle was stopped for a speeding violation. Owens' consent to search and Murray's spontaneous admission supplied the probable cause necessary to search the bag. Procedure 7.19 does not provide greater protections than the Fourth Amendment, and does not provide an independent basis for reversal in this case.

The Superior Court did not abuse its discretion in denying Murray's motion to suppress. Because the majority concludes otherwise, I respectfully dissent.

**68.** *See Brendlin v. California,* 551 U.S. 249, 256–58, 127 S.Ct. 2400, 168 L.Ed.2d 132 (U.S.2007); *Maryland v. Wilson,* 519 U.S. 408, 414–15, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (holding that, during lawful traffic stop, officer may order passenger to exit car without reasonable suspicion of safety risk).